## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

**OSCAR YANES, GAGIK MKRTCHIAN,**
and **WENDELL BAEZ LOPEZ**, on behalf
of themselves and all those similarly situated,

Petitioners-Plaintiffs,

v.

**DANIEL W. MARTIN**, Warden, Donald
W. Wyatt Detention Facility; **CHAD F.
WOLF**, Acting Secretary, U.S. Department
of Homeland Security; **MATTHEW T.
ALBENCE**, Acting Director, U.S.
Immigration and Customs Enforcement;
**TODD M. LYONS**, Acting Field Office
Director, U.S. Immigration and Customs
Enforcement; and **CENTRAL FALLS
DETENTION FACILITY
CORPORATION**,

Respondents-Defendants.

Civil Action No. ___

## PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 AND CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Petitioners-Plaintiffs Oscar Yanes, Gagik Mkrtchian, and Wendell Baez Lopez

("Petitioners") seek urgent relief for a putative class of over 70 civil immigration detainees whose

detention by Respondents-Defendants ("Respondents") at the Donald W. Wyatt Detention Facility

("Wyatt") in Central Falls, Rhode Island—site of a substantial and fast-growing COVID-19

outbreak—places them in unreasonable danger in violation of the Fifth Amendment; and for the

subclass of detainees at heightened risk of serious illness or death once infected. The key

constitutional issue raised here was effectively resolved against Respondents in *Sallaj v. ICE*, C.A.

No. 20-167-JJM-LDA, 2020 WL 1975819 (D.R.I. Apr. 24, 2020). There, the Court recognized

that "the spread of Covid-19 in a closed facility, such as an immigration detention center, would be devastating"; and that "spread of Covid-19 in [Wyatt] would be disastrous for the health and safety of those living and working there, as well as the burden it would cause on valuable medical resources." *Id.* at *2, 4. Petitioners here, like the petitioner in *Sallaj*, have "a likelihood of success on the merits of [their] Fifth Amendment claim [for release from Wyatt] because continuing to hold [them] in civil detention at the Wyatt, where COVID-19 is present, could expose [them] to an unnecessary substantial risk of serious harm to [their] health." *Id.* at *3.

2.      As of the April 24 order in *Sallaj*, there were six confirmed cases of COVID-19 among Wyatt detainees. *Id.* at *2. That number has now exploded to 38—a more than six-fold increase in just three weeks. *See* Status Report (May 14, 2020) at 1, *In re Donald W. Wyatt Detention Facility*, No. 1:20-mc-00004-JJM ("*In re Wyatt*"), Dkt. No. 11. For the reasons already recognized in *Sallaj*, the disease's continued spread poses an unreasonable risk to the health and lives of *all* civil immigration detainees held in Wyatt—including "older people," those with "pre-existing [medical] conditions," as well as "young people without preexisting conditions." *See Sallaj*, 2020 WL 1975819, at *1. To prevent "devastating" and "disastrous" consequences, *id.* at *2, 4, class-wide relief is necessary "to reduce the population in the detention facilit[y] so that all those who remain (including staff) may be better protected." *See Savino v. Souza*, --- F. Supp. 3d ----, 2020 WL 1703844, at *9 (D. Mass. Apr. 8, 2020) ("*Savino I*") (certifying class and implementing an individualized bail process for the release of immigration detainees in Bristol County, Massachusetts to prevent widespread infection with COVID-19); *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 2404923 (D. Mass. May 12, 2020) ("*Savino II*") (noting that "[b]etween the filing of the case [on March 27, 2020] and the [court's entry of a] preliminary injunction [on May 7], . . . forty-four [detainees] were granted bail by this Court"); *accord Zepeda*

*Rivas v. Jennings*, --- F. Supp. 3d ---, 2020 WL 2059848, at *3 (N.D. Cal. Apr. 29, 2020) ("implement[ing] a system for considering individual bail applications [for immigration detainees], modeled after a system created and successfully implemented [in *Savino*] by Judge Young in the District of Massachusetts"); *Gomes v. DHS*, No. 20-CV-453-LM, 2020 WL 2113642, at *1, 4 (D.N.H. May 4, 2020) (following *Savino* and *Zepeda Rivas* and "provisionally certif[ying] the proposed class of all individuals who are now held in civil immigration detention at [a New Hampshire detention center] for the purpose of facilitating expedited bail hearings of those individuals").

3.    "[W]hile older people with pre-existing conditions are the most vulnerable, young people without preexisting conditions have become severely ill because of Covid-19, which, in some cases, has led to death." *Sallaj*, 2020 WL 1975819, at *1; *accord Zepeda Rivas*, 2020 WL 2059848, at *3 ("[E]xposure to the virus [is not] a significant danger merely to people in high-risk groups; as explained in *Savino v. Souza*, it is dangerous to everyone.") (citing *Savino I*, 2020 WL 1703844, at *7). Indeed, a CDC study of COVID-19 hospitalizations issued since the Court's decision in *Sallaj* found that "[a]mong hospitalized patients, 26% lacked high-risk factors for severe COVID-19" such as old age or underlying medical conditions "and 5% of these patients died," which indicates "that SARS-CoV-2 infection can cause significant morbidity in relatively young persons without severe underlying medical conditions."[1]

4.    Wyatt reported the first positive test of a detainee on April 21, just days after this Court ordered the facility to begin reporting the number of detainees tested and the number of positive tests. *See* General Order, *In re Wyatt*, Dkt. No. 1 (Apr. 16, 2020); Status Report (Apr. 21,

---

[1] CDC Morbidity & Mortality Weekly Report, *Characteristics & Clinical Outcomes of Adult Patients Hospitalized with COVID-19—Georgia, March 2020*, at 5-6, Apr. 29, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6918e1-H.pdf.

2020) at 1, *In re Wyatt*, Dkt. No. 3. As of May 14, there are 38 confirmed cases among Wyatt

detainees at Wyatt, including two ICE detainees. *See* Status Report (May 14, 2020), *In re Wyatt*,

Dkt. No. 11; ICE, *ICE Guidance on COVID-19*, "Confirmed Cases" Tab,

https://www.ice.gov/coronavirus (last updated May 14, 2020, 5:36 p.m.). In addition, there have

been ten positive tests among cases among Wyatt staff, as self-reported to the facility, as of May

14. Status Report (May 14, 2020), *In re Wyatt*, Dkt. No. 11.

  5. The only effective means of preventing the spread of COVID-19 is social

distancing, where people remain at least six feet apart from each other. But conditions at Wyatt

render social distancing impossible. Immigration detainees at Wyatt continue to be housed with

cellmates in small cells measuring approximately five feet by nine feet. Immigration detainees eat

meals as a group in common area at small shared tables less than three feet across or they must

wait together to receive food. They share communal showers and telephones that are not

disinfected between uses. Correctional officers and other Wyatt staff rotate regularly in and out of

the facility, each potentially carrying additional infection from the outside world or other parts of

the facility. The federal government's own medical subject matter experts have described this as a

"tinderbox scenario,"[2] and a recent study found that between 72 percent and nearly 100 percent of

ICE detainees who remain at facilities nationwide would likely be infected with COVID-19 within

90 days of the current outbreak within the immigration detention system.[3] The same researchers

predict that between 78 and 95 percent of ICE detainees at Wyatt will be infected.[4]

---

[2] Letter from Scott A. Allen, MD, FACP & Josiah Rich, MD, MPH to Congressional Committee Chairpersons 6, (Mar. 19, 2020), *available at* https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf.

[3] Irvine et al., *Modeling COVID-19 & Impacts on ICE Detention Facilities, 2020*, J. Urban Health (forthcoming 2020), attached hereto as Exhibit C to Attachment 7, Declaration of Sarah Mujahid ("Mujahid Decl.);

[4] Irvine et al., *Modeling COVID-19 & Impacts on ICE Detention Facilities, 2020*, Wyatt Detention Center, www.icecovidmodel.org.

6.     Courts, government officials, and medical professionals have recognized reducing detained populations to permit social distancing is essential to protecting both detained individuals and the public at large from COVID-19. Such releases not only protect immigration detainees from transmission of the virus that causes COVID-19, they also reduce the risk to others working at or confined to a prison, jail, or detention center. This, in turn, reduces the burden on the surrounding region's health care infrastructure, lessens the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time, and thereby broadly protects public health. As the court in *Savino* recently observed: "The virus, if allowed to thrive in the detention centers, will migrate back into our neighborhoods. . . . [Detention center] [e]mployees returning to their homes after their shifts may expose their families, friends, bus drivers, cashiers, and doctors. The chain of infection thus grows. Were the government to loose an uncontainable viral outbreak from within its detention centers, it would betray its duty to the *public*, not just to the detainees." *Savino II*, 2020 WL 2404923, at \*11.

7.     Respondents cannot justify continuing to subject Petitioners to extraordinary risk of illness and death without any legitimate government objective, particularly in light of the alternatives available to them to maintain custody and supervision over Petitioners. The danger posed by Petitioners' detention during the current outbreak of COVID-19 is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

8.     In short, "[t]he risk of contracting COVID-19 in a detention center, such as the Wyatt, is dangerously high" because "conditions of confinement inherently prevent one's ability to socially distance, which, until a treatment is discovered, or a vaccine developed, is the best measure to reduce the spread of the disease." *Sallaj*, 2020 WL 1975819, at \*3.

9.     "Courts around the country are recognizing this fact." *Id.*; *see, e.g., Savino I*, 2020 WL 1703844, at *9 ("[T]he Court follows the light of reason and the expert advice of the CDC in aiming to reduce the population [of immigration detainees] in the [Bristol County] detention facilities so that all those who remain (including staff) may be better protected."); *Zepeda Rivas*, 2020 WL 2059848, at *2-3 ("There is no need to repeat a discussion of the 'tinderbox' risk of the virus spreading in crowded detention facilities. Nor is there need to recount the health risks posed by the virus—not just for people in high-risk categories but for healthy people as well. In detention facilities throughout the nation, ICE has failed to take sufficient action to address the obvious health risks to detainees. . . . The conditions of confinement do not merely threaten detainees; they also threaten facility staff, not to mention the greater community whose health is put at risk by the congregation of large groups in cramped spaces.") (footnotes omitted); *Jimenez v. Wolf*, No. 18-10225-MLW, Dkt. No. 507 (D. Mass. Mar. 26, 2020) (ordering release of immigrant detainee in the midst of the COVID-19 pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is difficult or impossible"); *Castillo v. Barr*, No. 20-cv-00605, 2020 WL 1502864, at *5-6 (C.D. Cal. Mar. 27, 2020) (ordering release of two immigration detainees upon concluding that "a civil detainee cannot [constitutionally] be subject to the current conditions of confinement at [immigration detention facility]" where "[detainees] are not kept at least 6 feet apart from others at all times" and "are forced to touch surfaces touched by other detainees, such as with common sinks, toilets and showers"; and recognizing that "the risk of infection in immigration detention facilities . . . is particularly high if an asymptomatic guard, or other employee, enters a facility"); *Basank v. Decker*, --- F. Supp. 3d ---, 2020 WL 1481503, at *3, 7 (S.D.N.Y. Mar. 26, 2020) (ordering immediate release of ten immigration detainees held in county

jails upon recognizing, *inter alia*, that "[t]he nature of detention facilities makes exposure and spread of [COVID-19] particularly harmful.").

10.    As in *Sallaj*, Respondents' actions in continuing to subject Petitioners and the putative class they seek to represent to this gravely heightened risk of COVID-19 infection violates the Fifth Amendment. *See Sallaj*, 2020 WL 1975819, at *3.

11.    In order to address this "urgent and unprecedented" situation, "a reduction in the number of people who are held in custody is necessary." *Savino I*, 2020 WL 1703844, at *9. This Court should follow the approach adopted in *Savino* by Judge William G. Young of the District of Massachusetts to protect a class of "[a]ll civil immigrant detainees" held in Bristol County, Massachusetts—directly adjacent to Providence County, where Wyatt is located. *Id.* Judge Young correctly recognized that a systemic mechanism for making "individualized [release] determinations, on an expedited basis" was needed "to reduce the population in the detention facilities so that all those who remain (including staff) may be better protected." *Id.* Pursuant to district courts' "[']inherent power to release[']" petitioners during habeas proceedings—including "in the case of 'a health emergency'"—Judge Young undertook a process to "diligently entertain[] bail applications" from class members to reduce the number of ICE detainees at the Bristol County facilities. *Id.* (quoting *Woodcock v. Donnelly*, 470 F.2d 93, 94 (1st Cir. 1972) (per curiam)). Through that process, Judge Young granted release on bail to 44 ICE detainees to bail over the course of several weeks through May 7, substantially reducing the immigration detainee population. *Savino II*, 2020 WL 2404923, at *2.

12.    Other courts in this Circuit and elsewhere are now addressing the class-wide dangers the pandemic poses to immigration detainees by "implementing [this] system for considering individual bail applications . . . created and successfully implemented by Judge Young

in the District of Massachusetts." *Zepeda Rivas*, 2020 WL 2059848, at *3; *accord Gomes*, 2020 WL 2113642, at *4 ("provisionally certif[ying] the proposed class of all individuals who are now held in civil immigration detention at [a New Hampshire detention center] for the purpose of facilitating expedited bail hearings of those individuals").

13.     In undertaking this expedited bail process, the Court should "prioritiz[e] people who have health vulnerabilities" that place them at particularly high risk for serious illness or death from COVID-19. *See Zepeda Rivas*, 2020 WL 2059848, at *1; Order, *Gomes v. DHS*, No. 20-CV-453-LM, Dkt. No. 52, at 1 (D.N.H. May 4, 2020) (concluding that subclass of medically "high-risk [immigration] detainees . . . were entitled to bail hearings, as occurred in *Savino*"); *cf. Medeiros v. Martin*, C.A. No. 20-178 WES, 2020 WL 2104897, at *3 (D.R.I. May 1, 2020) (finding that "members of the medically vulnerable population" are at "risk of serious complications" from COVID-19).

## PARTIES

14.     Petitioner Oscar Yanes is a 44-year-old citizen of El Salvador, who has lived in the United States since 1993 and has three U.S. citizen children. He has been held as a civil immigration detainee in the custody of U.S. Immigration and Customs Enforcement ("ICE") since September 2019, and has been held at Wyatt since October 2019. He is presently detained in pod J-2. He suffers from diabetes, for which he takes insulin twice a day. Mr. Yanes has had difficulty regulating his diet while at Wyatt and has experienced high blood glucose levels, blurry vision, dizziness, and swelling in his leg. Declaration of Oscar Yanes ("Yanes Decl."), attached hereto as Attachment 1, at ¶¶ 1-2, 4-5, 8-10. The CDC has recognized that people with diabetes are "at high-

risk for severe illness from COVID-19."[5]  Like all other civil immigration detainees at Wyatt, Mr. Yanes is at risk of imminent COVID-19 infection.

15.     Petitioner Gagik Mkrtchian is a 40-year-old citizen of Armenia and U.S. lawful permanent resident who has lived in the United States since 1991. His mother and brother are both U.S. citizens. Mr. Mkrtchian has been in ICE custody at Wyatt since December 2019, and is presently detained in pod J-2. His removal proceedings are presently on appeal before the Board of Immigration Appeals. Mr. Mkrtchian suffers from asthma, has had at least four asthma attacks in the last six months, and has been prescribed asthma medication. Declaration of Gagik Mkrtchian ("Mkrtchian Decl."), attached hereto as Attachment 2, at ¶¶ 1-2, 5-6. The CDC has recognized that people with asthma are "at high-risk for severe illness from COVID-19."[6] Like all other civil immigration detainees at Wyatt, Mr. Mkrtchian is at risk of imminent COVID-19 infection.

16.     Petitioner Wendell Baez Lopez is a 21-year-old citizen of the Dominican Republic who has lived in the United States since 2018. He was previously detained as a pre-trial criminal detainee at Wyatt, and was transferred to ICE custody in Wyatt's pod J-2 in April 2020. Declaration of Wendell Rafael Baez Lopez ("Baez Decl."), attached hereto as Attachment 3, at ¶¶ 1-2, 4. Like all other civil immigration detainees at Wyatt, Mr. Baez is at risk of imminent COVID-19 infection.

17.     Defendant Daniel W. Martin is the Warden of the Donald W. Wyatt Detention Facility where the Petitioners and all putative class members are detained. He is named as a Respondent in his official capacity and is a physical custodian of Petitioners.

---

[5] Centers for Disease Control and Prevention, *People Who Are at High Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 14, 2020).
[6] *Id*.

18.     Respondent Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security ("DHS"), the executive Department in charge of Petitioner's detention. In his capacity as DHS Acting Secretary, he has responsibility for the administration of immigration laws pursuant to 8 U.S.C. § 1103(a) and has authority over ICE and its field offices. He is named as a Respondent in his official capacity and is a legal custodian of Petitioners.

19.     Matthew T. Albence is the Acting Director of ICE, the federal agency within DHS that is directly in charge of Petitioners' detention. He is named as a Respondent in his official capacity and is a legal custodian of Petitioners.

20.     Respondent Todd M. Lyons is the Acting Field Office Director for the Boston Field Office of ICE Enforcement and Removal Operations ("ERO"), the ICE division that manages and oversees the immigration detention system. In his capacity as Field Office Director for ERO, he exercises control over and is a custodian of civil immigration detainees at Wyatt, including Petitioners. He is named as a Respondent in his official capacity and is a legal custodian of Petitioners.

21.     Respondent Central Falls Detention Facility Corporation ("CFDFC") is a municipal corporation governed by a five-member Board of Directors appointed by the Mayor of Central Falls. R.I. Gen. Laws § 45-54-1. The Board, in turn, appoints the warden, who is responsible for overseeing the management and overall operation of the corporation and Wyatt. Wyatt is a maximum-security facility that can house up to 770 detainees in the legal custody of the United States Marshals Service, the Federal Bureau of Prisons, ICE, the United States Navy, and the Mashantucket Pequot Tribe.[7]

---

[7] Donald W. Wyatt Detention Facility, *About the Facility*, http://www.wyattdetention.com/ (last accessed May 14, 2020).

## JURISDICTION AND VENUE

22.    Jurisdiction is proper and relief is available pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (original jurisdiction), 2201-02 (declaratory relief), and 2241 (habeas corpus jurisdiction), and Article 1, Section 9, clause 2 of the United States Constitution (the Suspension Clause). This Court has the power in equity to issue declaratory and injunctive relief for violations of the Constitution by federal officials. *See Ex Parte Young*, 209 U.S. 123 (1908); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 620 (1912) (applying *Ex Parte Young* principle to federal government officials). The United States has waived sovereign immunity for this action for declaratory and injunctive relief against one of its agencies and that agency's officers are sued in their official capacities. *See* 5 U.S.C. § 702.

23.    Venue in the District Court for the District of Rhode Island is proper under 28 U.S.C. § 1391 because at least one Defendant resides in this District, Petitioners are currently detained at Wyatt within this District, and a substantial part of the event giving rise to the claims in this action took place in this District. Venue is also proper under 28 U.S.C. § 2243 because the immediate custodian of all the Petitioners resides in this District.

## FACTS

### The COVID-19 Pandemic is Spreading Quickly and Poses Grave Risk of Serious Illness and Death

24.    The outbreak of COVID-19 has reached pandemic status.

25.    The risks and consequences of COVID-19 cannot be understated. It has been just over four months since the World Health Organization was first informed about a cluster of 41 patients in China with a mysterious pneumonia. Since then, COVID-19 has spread around the globe, shut down entire countries, and killed hundreds of thousands. In the United States alone,

more than 1.38 million cases of infection have been confirmed to date and 83,947 people have died as of May 14.[8]

26.    People of all ages, with and without preexisting conditions, have died from COVID-19.

27.    As of May 14, there were more than 12,000 confirmed COVID-19 cases in Rhode Island, and at least 468 people have died from the disease.[9]

28.    Rhode Island is especially vulnerable. On April 15, Dr. Deborah Birx, Coronavirus Response Coordinator for the White House Coronavirus Task Force, specifically "highlight[ed]" the Task Force's "concern[]" for Rhode Island, and the Providence area specifically, which is "in a unique situation," "caught between two incredible [coronavirus] hot spots": it first "had increasing cases from the New York City area and now [has] an increase in cases from the Boston area."[10] Rhode Island continues to see new cases reported each day, and ranks eighth highest among states as to number of cases per 100,000 people. Declaration of Joseph J. Amon ("Amon Decl."), attached hereto as Attachment 4, at ¶ 6. The state already has "widespread" community transmission, and further increases in cases will strain Rhode Island's limited medical infrastructure. *Id.* ¶¶ 32.a, 49. Even though the rate of newly confirmed cases appears to have slowed, there are likely at least another 18 to 24 months of significant COVID-19 activity, including second and third "waves" of increased transmission. *Id.* ¶ 19.

---

[8] CDC, *Cases in U.S.* (last updated May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html.
[9] *Rhode Island COVID-19 Response Data*, Rhode Island Department of Health (last updated May 14, 2020), https://health.ri.gov/data/covid-19/.
[10] Betsy Klein, *Birx Concerned Rhode Island Reemerging as Covid-19 Hotspot*, CNN (Apr. 15, 2020), https://www.cnn.com/asia/live-news/coronavirus-pandemic-intl-04-15-20/h_af7368925ea3d84fd67369e9e6ac0559.

29. COVID-19 is easily transmitted and the numbers of confirmed cases and deaths are expected to continue to grow exponentially. *See* Declaration of Dr. Jonathan Louis Golob ("Golob Decl."), attached hereto as Attachment 5, at ¶ 2.

30. All human beings share an equal risk of contracting and, upon contraction, transmitting the virus that causes COVID-19. Any adult who contracts the virus may experience life-threatening symptoms and death. *Id.* ¶¶ 4-5, 8, 14.

31. New information regarding COVID-19 risk factors is released daily by public health authorities. Beyond the extreme risks to all, the categories of individuals who may have conditions or characteristics that predispose them to complications from COVID-19 are growing— and not fully identified by medical experts.

32. Even those who survive COVID-19 are likely to suffer long-term damage to their health. COVID-19 can severely damage lung tissue, which requires an extensive period of hospitalization and rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. More is learned each passing day about the extent of permanent injury that may be caused by COVID-19. *Id.* ¶¶ 9, 14.

33. COVID-19 may also target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work. *See id.*

34. People of all ages and medical backgrounds who have experienced serious cases of COVID-19 describe painful symptoms, including vomiting, severe diarrhea, relentless shivering, and suffocating shortness of breath.

35. Emerging evidence suggests that COVID-19 can also trigger an over-response of the immune system further damaging tissues in a cytokine release syndrome that can result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury. *See id.*

36. These complications can manifest at an alarming pace. Individuals can show the first symptoms of COVID-19 infection in as little as two days after exposure, and their condition can seriously deteriorate in five days or sooner. *Id.* ¶ 6.

37. People who are asymptomatic can also spread the coronavirus which causes COVID-19, making testing or seclusion of only those who are symptomatic an ineffective solution. *See id.* ¶ 6.

38. Most people who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, even in non-detention settings, and an entire team of dedicated medical care providers. *See id.* ¶ 8.

39. The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 than from influenza. *Id.* ¶ 4. According to recent estimates, the fatality rate of people with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems. *Id.* For people in the highest risk populations, the fatality rate of COVID-19 is about 15 percent—or one in seven people. *Id.*

40. Those who survive serious cases of COVID-19 should expect a prolonged recovery, including the need for extensive rehabilitation for profound reconditioning, loss of digits, neurologic damage, and the loss of respiratory capacity.

41.    There is no vaccine against COVID-19, no cure, and no FDA-approved treatment for COVID-19; nor is there any known medication to prevent or treat infection. Golob Decl. ¶ 10; Amon Decl. ¶ 7.

42.    The CDC advises that the coronavirus which causes COVID-19 is thought to spread mainly from person to person, between people who are in close contact with one another (within about six feet), and through respiratory droplets produced when someone speaks, coughs, or sneezes, including by touch of shared surfaces.[11]

43.    The only known effective measure to reduce the risk of illness, injury or death from COVID-19 is to prevent people from being infected by the virus in the first place. Social distancing—or remaining physically separated from known or potentially infected individuals— and vigilant sanitation and hygiene, including repeatedly and thoroughly hand washing with soap and water, are the only known effective measures for protecting people from COVID-19. Golob Decl. ¶ 10; Amon Decl. ¶ 14. "[W]hile hand washing and disinfecting surfaces is advisable, the main strategy for limiting disease transmission is social distancing and . . . for such distancing to be effective it must occur before individuals display symptoms." Amon Decl. ¶ 14.

44.    Initial CDC projections indicated that, if unchecked, the virus likely would infect over 210 million people in the United States and cause as many as 1.7 million deaths.[12]

45.    In response to this pandemic, states have taken extraordinary and unprecedented measures to ensure that people practice "social distancing" in order to halt the spread of COVID-19. In Rhode Island, for example, the Governor has declared a state of emergency, ordered the closure of all non-essential businesses, and prohibited gatherings of more than five people. The

---

[11] CDC, *Coronavirus (COVID-19),* https://www.cdc.gov/coronavirus/2019-ncov/index.html (last visited May 14, 2020).
[12] Sheri Fink, "Worst-Case Estimates for U.S. Coronavirus Deaths," *The New York Times* (Mar. 18, 2020), https://www.nytimes.com/2020/03/13/us/coronavirus-deaths-estimate.html; *see* Golob Decl., ¶ 11.

Governor had also ordered all residents to stay home and avoid all unnecessary travel and activities.[13] Appropriately, none of these measures in Rhode Island have been limited to only those who are medically vulnerable. On May 9, Governor Raimondo lifted the stay at home order left numerous restrictions in place—including a prohibition on social gatherings of more than five— and to strongly advise medically vulnerable individuals to remain at home.[14]

46.    Similarly, this Court has acknowledged that as "the threat to public health and safety presented by the COVID-19 pandemic has become more widely understood" there is a "threat to public health and safety presented by public gatherings."[15] Thus, the Court has issued multiple orders designed to slow the spread of COVID-19, including closing the federal courthouse with limited exceptions.[16] This Court has acknowledged the multiple applications for relief from persons detained in Wyatt citing "the risk of contracting COVID-19 because of their continued confinement," and, as a result, ordered the Warden of Wyatt to file twice-weekly status reports "concerning the incidence of infection of COVID19 at Wyatt and the measures undertaken to mitigate the spread of COVID-19 at Wyatt." *See* General Order, *In re Wyatt*, Dkt. No. 1 (Apr. 16, 2020).

47.    Recent data appears to show that social distancing is working to slow the spread of the coronavirus which causes COVID-19 and, accordingly, projections as to the scope of the pandemic have lessened. However, public health experts warn that an ease of social distancing

---

[13] *Rhode Island COVID-19 Information*, Rhode Island Department of Health, https://health.ri.gov/covid/ (last visited May 14, 2020).
[14] *Id.*; Gov. Gina M. Raimondo, Rhode Island Executive Order 20-32, May 8, 2020, http://governor.ri.gov/documents/orders/Executive-Order-20-32.pdf.
[15] District of Rhode Island, Second General Order Regarding Continuity of Operations During Coronavirus Pandemic (Mar. 19, 2020), *available at* https://www.rid.uscourts.gov/sites/rid/files/documents/generalorders/Amended%20General%20Order%20Pandemic%20for%20Building%20Entrance%20-%20FINAL.pdf.
[16] *Id.*

preventative measures will likely result in a resurgence of COVID-19 infections and a return to more ominous projections as to the pandemic's toll.[17]

48.     As recognized in *Sallaj*, "while older people with pre-existing conditions are the most vulnerable [to Covid-19], young people without preexisting conditions have become severely ill because of Covid-19, which, in some cases, has led to death." *Sallaj*, 2020 WL 1975819, at *1. Indeed, a CDC report issued on April 29 "provid[ing] valuable data on a large cohort of hospitalized [COVID-19] patients" found that "[a]mong hospitalized patients, 26% lacked high-risk factors for severe COVID-19"—such as old age or underlying medical conditions—"and 5% of those patients died."[18] This indicates "that SARS-CoV-2 infection can cause significant morbidity in relatively young persons without severe underlying medical conditions."[19] In other words, "*all adults, regardless of underlying conditions or age*, are at risk for serious COVID-19-associated illness."[20]

### People Detained at Wyatt are at an Elevated Risk of COVID-19 Transmission, Infection and Illness.

49.     Immigration detention facilities are congregate environments, places where people live and sleep in close proximity. *See, e.g.*, Amon Decl. ¶ 22.; Golob Decl. ¶¶ 12-13; Declaration of Dr. Dora Schriro ("Schriro Decl."), attached hereto as Attachment 6, at ¶¶ 23, 31.

50.     As of May 14, Wyatt reports that there are 71 noncitizens currently held at Wyatt as civil immigration detainees. *See* Status Report (May 14, 2020) at 1, *In re Wyatt*, Dkt. No. 11.

---

[17] *See, e.g.*, Dr. Benjamin P. Chan, N.H. Division of Public Health Services, *COVID-19 The Future of the Epidemic in NH* (Apr. 9, 2020), https://www.nh.gov/covid19/documents/covid-19-epidemic-20200409.pdf.
[18] CDC Morbidity & Mortality Weekly Report, *Characteristics & Clinical Outcomes of Adult Patients Hospitalized with COVID-19—Georgia, March 2020*, at 5-6, Apr. 29, 2020, available at https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6918e1-H.pdf.
[19] *Id.* at 5.
[20] *Id.* at 6 (emphasis added).

51.     Until recently, civil immigration detainees were housed at Wyatt in two of its twelve housing units or "pods": J-1 pod and J-2 pod. According to Wyatt, however, J-1 has been converted into "the Facility's primary quarantine pod." *See id.* at 8.

52.     It is impossible for ICE detainees to maintain social distancing at Wyatt. Petitioners are housed in J-2, where the 5-foot by 9-foot cells are generally shared by two detainees. Detainees sleep in bunk beds bolted to the wall, with only about four feet of vertical space between the top and bottom bunks. They share a communal bathroom with five showers that are not cleaned between uses. Detainees at Wyatt live in close proximity of each other or Wyatt personnel, including in the common areas, where they spend much of their time and where it is not possible to maintain six feet of social distancing. Meanwhile, new detainees are transferred into the pod frequently. Baez Decl. ¶¶ 4-28; Mkrtchian Decl. ¶¶ 9-27; Yanes Decl. ¶¶ 11-22.

53.     Respondents have conceded that the Wyatt cannot comply with CDC recommendations on social distancing and limits on the size of gatherings. Baez Decl. ¶ 16; Mkrtchian Decl. ¶ 14; Yanes Decl. ¶ 18. Instead, Petitioners spend much of their days in common areas with as many as 40 people under conditions that make social distancing impossible. Baez Decl. ¶¶ 16-18; Mkrtchian Decl. ¶¶ 17-20.

54.     Petitioners and the other ICE detainees must line up within a foot of each other for meals. Most of the detainees in line do not wear masks, and none wear gloves. One of the detainees who has the job of serving food has been sick for a long time, has red eyes, and has been coughing. He is afraid to report his symptoms for fear that he will be punished or put into isolation. Baez Decl. ¶¶ 20; Mkrtchian Decl. ¶ 17; Yanes Decl. ¶¶ 13.

55.     Once they get their food, Petitioners sit to eat at small tables of four less than arm's length of each other, in immovable seats. Baez Decl. ¶ 21; Mkrtchian Decl. ¶ 17; Yanes Decl. ¶ 13.

56.    In addition to eating together in a common area, Petitioners exercise together, watch TV together, and socialize together, all in a common area where maintaining social distancing is impossible. Baez Decl. ¶ 22; Mkrtchian Decl. ¶ 18.

57.    The telephones in the common area—which are the only means for Petitioners to stay in touch with their families since visitation is suspended—are not cleaned after each use, and Petitioners have no means to clean the phones. Baez Decl. ¶ 22; Mkrtchian Decl. ¶ 22; Yanes Decl. ¶ 14.

58.    Although Respondents have told Petitioners that J-2 pod is on "lockdown" and instituted a system of staggered breaks to limit the number of detainees outside their cells, the guards have frequently not followed this procedure and have allowed detainees out of their cells outside of the specific times, and do not monitor whether detainees return to their cells. Baez Decl. ¶ 19; Mkrtchian Decl. ¶ 13.

59.    The risk of spreading COVID-19 throughout the facility is greatly increased because correctional officers and staff rotate regularly throughout the facility. Correctional officers alternate between working in areas that house detainees held by the U.S. Marshals Service—where at least 36 detainees have tested positive for COVID-19—and the areas where Petitioners are held. Baez Decl. ¶¶ 4-6; Mkrtchian Decl. ¶ 26; Yanes Decl. ¶ 21.

60.    Correctional officers at Wyatt do not practice social distancing. They eat and work in close proximity to each other. Although correctional officers have been issued masks, they often take them off and let them hang around their necks. Baez Decl. ¶ 10-11; Mkrtchian Decl. ¶ 16; Yanes Decl. ¶ 21.

61.    Petitioners were issued masks in the last week of April but were not told how to wear them or when to wear them. Many detainees are not wearing masks. The masks that were

given to Petitioners have not been washed. Some of the detainees have left their masks on the dining tables and forgotten them. Baez Decl. ¶ 23; Mkrtchian Decl. ¶ 19; Yanes Decl. ¶ 17.

62.      Respondents have not provided Petitioners or other Wyatt ICE detainees sufficient information about COVID-19. In March, ICE detainees asked Wyatt and ICE officials to explain what they were doing to keep them safe during the pandemic. On April 4, after they received no response, the detainees went on a hunger strike. Rather than providing information about what they were doing to protect them from COVID-19, Respondents put the ICE detainees on lockdown and punished detainees who were perceived as instigators by placing them in isolation. Yanes Decl. ¶¶ 6-7; Mkrtchian Decl. ¶¶ 23-24. Petitioner Mkrtchian was placed in isolation for 22 days for his perceived role in the hunger strike. Mkrtchian Dec. ¶ 24.

63.      Since the hunger strike, Respondents have given Petitioners false information about the spread of COVID-19. On May 6th, Respondent Martin talked to Petitioners about the pandemic and falsely stated that the virus cannot be spread by asymptomatic persons. He further falsely stated that the virus cannot be spread via surfaces. When Petitioners challenged him on these statements, Respondent Martin became upset and did not respond. Baez Decl. ¶¶ 8-12; Mkrtchian Decl. ¶¶ 9-11; Yanes Decl. ¶ 18.

64.      Respondents have not instructed Petitioners or other ICE detainees on the necessity of frequent handwashing and have not made it possible for them to maintain proper hygiene. Petitioners and other detainees have not been given adequate cleaning supplies. If detainees wish to clean their cells, they are not given paper towels; instead they must use their towels to wipe the cells, even though they are only issued one clean towel per week. Baez Decl. ¶ 27; Mkrtchian Decl. ¶ 20; Yanes Decl. ¶¶ 15, 18.

65.    Detainees have not received any soap since mid-April, and many detainees have stopped showering and washing. Petitioners have also not been given any hand sanitizer. Baez Decl. ¶¶ 15, 23-24; Mkrtchian Decl. ¶ 20; Yanes Decl. ¶ 16.

66.    Petitioners and other ICE detainees share five showers, and the showers are not cleaned between uses. Baez Decl. ¶ 27-28; Yanes Decl. ¶ 17.

67.    Although Petitioners have asked to be tested for COVID-19, Wyatt officials have told them that they will be tested only if they show symptoms for many days. Respondents have not conducted any COVID-19 testing of asymptomatic ICE detainees. Instead, around April 25, Wyatt staff took the temperatures of all the ICE detainees, but that is the only testing Petitioners have received. Baez Decl. ¶¶ 13, 26; Mkrtchian Decl. ¶¶ 10, 26; Yanes Decl. ¶ 19.

68.    Respondents have refused to tell Petitioners what happens to detainees who test positive for COVID-19. Mkrtchian Decl. ¶ 12; Baez Decl. ¶ 9; Yanes Decl. ¶ 20. Detainees do not feel comfortable reporting that they are sick for fear that they will be sent to isolation or otherwise punished. Petitioner Baez reports that at least nine fellow detainees have told him that they are not feeling well but are afraid to speak to nurses or guards about their symptoms. Baez Decl. ¶ 25; Mkrtchian Decl. ¶ 27.

69.    COVID-19 is already spreading rapidly through Wyatt. In Wyatt's first status report to this Court on April 20, it reported zero cases of COVID-19. *See* Status Report (Apr. 20, 2020), *In re Wyatt*, Dkt. No. 2. Only one day later, on April 21, Wyatt reported that one detainee had tested positive. *See* Status Report (Apr. 21, 2020), *In re Wyatt*, Dkt. No. 3.[21] Just three weeks later, on May 14, Wyatt reported that 38 detainees have tested positive and 10 of its staff members have "self-reported" as having tested positive. *See* Status Report (May 14, 2020), *In re Wyatt*, Dkt. No.

---

[21] Wyatt, Status Report (April 21, 2020), *available at* https://www.rid.uscourts.gov/sites/rid/files/wyattreport2.pdf

11. According to ICE, that number includes at least two ICE detainees who have tested positive for COVID-19.[22]

### Respondents' Responses to COVID-19 Are Inadequate and Will Not Protect Petitioners

70.    Infectious diseases that are communicated by air or touch are more likely to spread in confined settings and crowded environments. *See, e.g.,* Amon Decl. ¶ 22. This presents an imminent danger for the spread of COVID-19 to Petitioners.

71.    The conditions of immigration detention facilities pose a heightened public health risk for the spread of COVID-19 that is even greater than non-carceral institutions. Immigration detention facilities have even greater risk of infectious spread because of overcrowding, the high proportion of vulnerable people detained, limited access to hygiene products, and scant medical resources. People live in close quarters and cannot achieve the social distancing needed to effectively prevent the spread of COVID-19. Petitioners find it impossible to maintain the recommended distance of six feet from others. They must also share or touch objects used by others. Toilets, sinks, and showers are shared, without disinfection between each use. Amon Decl. ¶¶ 22, 37, 39, 40. Food preparation, service, and dining are communal with little opportunity for surface disinfection. *Id.* at ¶¶ 22, 30.d, 38.g, 39, 40. Staff arrive and leave on a shift basis, and Wyatt is not adequately screening or testing staff for new, asymptomatic infection. *Id.* at ¶¶ 32-33, 40-41, 46. Even under ordinary circumstances, many immigration detention facilities lack adequate medical infrastructure and sanitation. *Id.* at ¶¶ 17, 22, 40, 48; Schriro Decl. ¶ 31, 46-52.

72.    Respondents are aware of the serious risks that COVID-19 poses to detained populations. First, Petitioners themselves have raised concerns at the ICE Facilities about the risks

---

[22] ICE, *ICE Guidance on COVID-19*, "Confirmed Cases" Tab, https://www.ice.gov/coronavirus Enforcement (last updated May 14, 2020, 5:35 p.m.).

they face from COVID-19, even going on hunger strike to protest the conditions and lack of transparency. Mkrtchian Decl. ¶ 23; Yanes Decl. ¶¶ 9-10. Advocacy groups have also notified Respondents about the threat posed by COVID-19 in ICE detention centers.[23]

73.     Respondents are also well aware of public health guidelines and the need to implement and facilitate social distancing to combat the COVID-19 pandemic. For example, in an April 10 guidance ("April 10 Guidance"), ICE belatedly acknowledged the risks of coronavirus infection and COVID-19 to those in immigration detention.[24] Although intended as a response to these risks, the April 10 Guidance is impractical and does not reflect the reality of the conditions at Wyatt. Dr. Joseph Amon, an infectious disease and correctional health expert, has concluded that the April 10 Guidance and related protocols "are inadequate to prevent or mitigate the rapid transmission of COVID-19 in the Wyatt facility." Amon. Decl. ¶ 28. They fail both because the protocols do not sufficiently implement necessary preventative measures, and because they lack a plan for the "identification of special protections for medically high-risk patients." *Id.* ¶ 29. "Because Wyatt fails to create increased protections for people with risk factors for serious illness and death from COVID-19, the Facility is unlikely to detect illness in these individuals until many of them have already been exposed to and contracted the coronavirus and fallen critically ill." *Id.* ¶ 31.d.

74.     Further, in its twice-weekly status report, Wyatt describes the efforts it is taking to mitigate the spread of COVID-19, noting that it "relies on and routinely refers to the guidelines issued by the Centers for Disease Control and Prevention for correctional and detention facilities."

---

[23] *See* Steven Brown of ACLU of Rhode Island, Cherie Cruz of Formerly Incarcerated Union of Rhode Island, and Mavis Nimoh of Center for Prisoner Health and Human Rights, March 9, 2020 Letter to Wyatt Warden Daniel Martin, attached hereto as Exhibit R to Attachment 7, Mujahid Decl.
[24] U.S. Immigration & Customs Enforcement, *COVID-19 Pandemic Response Requirements* (Apr. 10, 2020), https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

*E.g.*, Status Report (May 14, 2020) at 3, *In re Wyatt*, Dkt. No. 11. Crucially, though, Wyatt does not claim to be fully *implementing* those guidelines. Based on his assessment of Wyatt's specific mitigation protocols, Dr. Amon concluded that they are also "insufficiently clear on several key points and are likely to be inadequate to prevent or mitigate the rapid transmission of COVID-19 in the Wyatt facility." Amon Decl. ¶ 28. Wyatt's guidance fails to make clear that social distancing is required, rather than just recommended; does not follow guidance from ICE or the CDC to identify and protect medically high-risk individuals; does not implement sufficient screening protocols to identity potentially infected individuals; and does not implement sufficient sanitation and cleaning measures to prevent the spread of COVID-19. *Id.* ¶¶ 30-33, 37, 39. Notably, Wyatt's current "lockdown" practices can reduce the likelihood that detainees receive medical treatment in a timely fashion, increases their risk of suicide and self-harm, increases the physical contact between detainees and guards, and may deter people from reporting their symptoms, which "would not only accelerate the spread of infection within facilities but could increase the likelihood of prisoner deaths due to lack of treatment." *Id.* ¶ 50. Accordingly, neither ICE's April 10 Guidance nor Wyatt's protocols address the numerous vectors of COVID-19 infection at Wyatt. *Id.* ¶ 40.

75.    Moreover, testing is still not being widely used or available at ICE facilities and, accordingly, ICE is essentially blind with respect to the scope of the epidemic amongst the civil immigration detainee population.[25]

76.    Former ICE officials have echoed these concerns and have called for aggressive measures to combat the spread of COVID-19 in ICE detention facilities. Former Acting ICE Director John Sandweg has written publicly about the need to release detainees because ICE detention centers "are extremely susceptible to outbreaks of infectious diseases" and "preventing

---

[25] ICE, *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (click on "Overview & FAQs" tab and scroll to "How are ICE detention facilities engaging in social distancing) (last visited May 14, 2020).

the virus from being introduced into these facilities is impossible."[26] He called for "releasing from custody the thousands of [ICE] detainees who pose no threat to public safety and do not constitute an unmanageable flight risk."[27]

77.     Dr. Dora Schriro—a former ICE official and immigration detention expert—has concluded that "the plans that ICE has put forth are insufficient to protect the detained population, detention staff, and the public at-large." Schriro Decl. ¶¶ 18; *see also id.* ¶ 31 (noting that ICE "failed to produce one complete and accurate set of instructions").[28] Dr. Schriro "recommend[s] that any other individuals deemed likely to comply on appropriate conditions of supervision where necessary, be released immediately to protect themselves, other detainees, correctional and medical staff, and the general public, without impeding immigration court proceedings or other legally-required appointments." *Id.* ¶ 78.

78.     Despite ICE's acknowledgement of both the problem and the solution, there is substantial evidence that ICE's COVID-19 protocols are not being followed in detention centers throughout the country, including Wyatt, and that ICE is otherwise failing to provide an adequate response, which exacerbates the risk of harm to Petitioners. Respondents continue to populate Wyatt at such a level that social distancing is impossible to maintain and have failed to either release or sequester civil immigration detainees to allow for social distancing and permit those with at-risk health conditions to be isolated from others.

---

[26] John Sandweg, *I Used to Run ICE. We Need to Release the Nonviolent Detainees*, The Atlantic (Mar. 22, 2020), https://www.theatlantic.com/ideas/archive/2020/03/release-icedetainees/608536/.
[27] ICE, *ICE Guidance on COVID-19*, "Overview & FAQs" Tab, "How are ICE Detention Facilities Engaging in Social Distancing," https://www.ice.gov/coronavirus (last updated Apr. 6, 2020, 1:27 p.m.).
[28] Among her many public service positions, Dr. Schriro served in 2009 as Senior Advisor to DHS Secretary Janet Napolitano on ICE Detention and Removal, and as the founding Director of the ICE Office of Detention Policy and Planning. She has also served Commissioner of the Connecticut Department of Emergency Services and Public Protection, as Connecticut's Homeland Security Advisor, as Commissioner of the municipal jail systems in St. Louis and New York City, and as Director of state correctional systems in Arizona and Missouri. Schriro Decl. ¶¶ 1-5

79.     Most notably, as of May 14, 2020, ICE has confirmed that there have been 965 confirmed cases of COVID-19 among civil immigration detainees in at least 45 facilities nationwide—including at Wyatt—and 44 confirmed cases among ICE employees at 15 facilities.[29] These reported numbers do not include third-party contractors (such as Wyatt employees) who have been infected, as ICE does not publicly report those numbers. Yet, Respondents are continuing to introduce new civil immigration detainees into Wyatt from other facilities and to house new civil immigration detainees with the general population and with persons in federal criminal custody during the initial quarantine period.

80.     On March 19, 2020, two medical subject matter experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties blew the whistle to Congress, writing "regarding the need to implement immediate social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public, *it is essential to consider releasing all detainees who do not pose an immediate risk to public safety.*" The experts expressed concern that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent." Moreover, even if ICE was consistently taking these precautions, the DHS experts have explained that they "won't be enough" without rapidly "releas[ing] those who do not pose an immediate danger to public safety." [30] Respondents nonetheless refuse to heed the advice of public health experts, including their own.

81.     Evidence further establishes that these serious defects are far from anomalous, but rather systemic in nature. Indeed, both Dr. Amon and Dr. Schriro join the chorus of public health and correctional health experts in concluding that the risk of contracting the coronavirus which causes COVID-19 is elevated by the inherent conditions created in congregate environments, the

---

[29] *Id.*, "Confirmed Cases" Tab (last updated May 14, 2020, 5:36 p.m.)
[30] Allen and Rich, *supra* note 3, at 5 (emphasis in original).

confinement conditions at Wyatt, unavailability of testing for the coronavirus, transmission of COVID-19 by people who are asymptomatic or pre-symptomatic, transfer of new detainees into civil immigration detainee populations, arrival and departure of staff, and the ineffectiveness of other preventative measures, besides social distancing, in these conditions. *E.g.*, Amon Decl. ¶¶ 13-15, 21-26, 28-29, 40, 47-50; Schriro Decl. ¶¶ 20, 23, 31, 54, 56, 59. Dr. Amon notes that the rate of spread in detention facilities "illustrates the dangers the conditions in Wyatt pose to those who are detained there, and to the broader community." Amon. Decl. ¶ 42. Nationally, the "highest rates of infection have been detected in jails." *Id.*

82.    Importantly, the COVID-19 pandemic—and ICE's inadequate and unreasonable response to it—will significantly strain the already subpar medical facilities available to Wyatt's civil immigration detainees. Long before the COVID-19 outbreak, numerous reports (including by DHS itself) have identified serious and substantial flaws in ICE's medical care system. For example, a 2017 OIG report that assessed care at certain ICE facilities identified "long waits for the provision of medical care[.]"[31] Other reports echo these alarming findings about substandard medical care in ICE facilities.[32]

83.    These elevated risks are not borne solely by detainees and Wyatt's staff. Dr. Amon notes that if and when the virus becomes prevalent in Wyatt, "[l]arge numbers of ill detainees and

---

[31] Off. of Inspector Gen., Off. of Homeland Sec., OIG-18-32: Concerns About ICE Detainee Treatment and Care at Detention Facilities, at 7 (Dec. 11, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017-12/OIG-18-32-Dec17.pdf.

[32] *See, e.g.*, U.S. Gov't Accountability Off. GAO-16-23: Additional Actions Needed to Strengthen Mgmt. and Oversight of Detainee Med. Care (Feb. 2016), https://www.gao.gov/assets/680/675484.pdf; Human Rts. Watch, Am. Civil Liberties Union, Nat'l Immigr. Just. Ctr. & Det. Watch Network, Code Red: The Fatal Consequences of Dangerously Substandard Med. Care in Immigr. Det, at 15, 19, 25, 46 (June 2018), *available at* https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration; Human Rights First, Prisons and Punishment: Immigration Detention in California, at 10-13 (Jan. 2019), https://www.humanrightsfirst.org/sites/default/files/Prisons_and_Punishment.pdf; J. David McSwane, ICE Has Repeatedly Failed to Contain Contagious Diseases, Our Analysis Shows. It's a Danger to the Pub., PROPUBLICA (Mar. 20, 2020), *available at* https://www.propublica.org/article/ice-has-repeatedly-failed-to-contain-contagious-diseases-our-analysis-shows-its-a-danger-to-the-public (analysis of DDRs demonstrates that ICE facilities have "long histories of mishandling infectious diseases that can rapidly spread outside their walls.").

corrections staff will also strain the limited medical infrastructure" in the community surrounding Wyatt. Amon. Decl. ¶ 49. He observed that "[t]his is of particular concern as Wyatt is located in Central Falls, Rhode Island, which currently has the highest number of cases of people who have tested positive for COVID-19 per 100,000 people in the state." *Id.* ¶ 34.b.

84.    Wyatt has already reported cases of COVID-19 among detainees, and as Dr. Amon further explains, outbreaks in detention facilities can spiral out of control. *See* Amon Decl. ¶ 42-46. As of May 14, jails and prisons account for five of the seven largest COVID-19 outbreaks in the United States, and two thirds of the outbreaks of more than 300 confirmed cases.[33] As Dr. Amon notes, many detainees—including those who are not medically vulnerable—are far safer in their respective communities than in a correctional or other detention facility where social distancing is difficult or impossible. *See* Amon Decl. ¶¶ 55-58.

85.    These predictions are further supported by a recent study, forthcoming in the Journal of Public Health, which found that 72 percent of individuals in ICE detention facilities are expected to be infected by the coronavirus by day 90 of the ICE system's ongoing outbreak under an *optimistic* contagion scenario, while nearly 100% of ICE detainees are expected to be infected in the same timeframe under a more pessimistic scenario.[34] Between 11 and 15% of ICE detainees likely will require hospitalization. The study discusses possible interventions, including that "[l]owering a facility's population density can slow the spread." As "the total number of infections drop, the time to peak infection shifts, and the proportion of the population infected is lower."[35] At Wyatt specifically, the same researches projected that between 78 and 95% of ICE detainees

---

[33] New York Times, *Coronavirus in the U.S.: Latest Map and Case Count*, "In America's nursing homes, outbreaks surge," https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last updated May 14, 2020, 3:03 p.m.).
[34] Irvine et al., *Modeling COVID-19 and Impacts on U.S. Immigration and Enforcement (ICE) Detention Facilities, 2020*, 2020, J. of Urban Health, attached hereto as Exhibit C to Attachment 7, Mujahid Decl.
[35] *Id.*

will be infected within 90 days of the first case of COVID-19 at the facility[36]—which occurred at least three weeks ago, sometime on or before April 21.

**The Only Way to Avert an Exponential COVID-19 Outbreak Among Wyatt's Immigration Detainees is to Begin Immediately Reducing the Population by Releasing Detainees**

86.    Risk mitigation is the only known strategy that can protect people from COVID-19 and Respondents, through actions and statements, have demonstrated that they are unwilling and unable to implement meaningful risk mitigation measures. Accordingly, both former ICE officials and public health experts with experience in immigration detention and correctional settings have recommended that detention centers immediately reduce their populations.

87.    According to Rhode Island Governor Gina Raimondo, "[s]ocial distancing is working, social distancing is saving lives."[37] Community mitigation includes social distancing—which is impossible among the ICE detainees at Wyatt unless a significant number of them are released.

88.    Furthermore, the routine practice of transferring immigrant detainees from one facility to another, throughout the nationwide immigration detention network and without widespread testing for the virus that causes COVID-19, makes the likelihood of COVID-19 spread and infection even more likely. For example, on April 11, 71 immigrant detainees were moved from facilities in New York and Pennsylvania to a third facility in Texas to facilitate social distancing at detention centers in the Northeast, but by April 29, at least 21 of those detainees had tested positive

---

[36] Irvine et al., *Modeling COVID-19 & Impacts on ICE Detention Facilities, 2020*, Wyatt Detention Center, www.icecovidmodel.org.

[37] AP, *Governor: Social Distancing Working to Keep Virus Cases Down*, Apr. 16, 2020, https://www.usnews.com/news/best-states/rhode-island/articles/2020-04-16/teen-helps-patients-stay-connected-during-pandemic.

for COVID-19.[38] Given such conditions and practices, one would be hard-pressed to think of a more effective means for the spread of COVID-19 than immigration detention.

89.    Petitioners do not seek release free of any supervision. ICE has a range of highly effective tools at its disposal to ensure that individuals report for court hearings and other appointments. Schriro Decl. ¶¶ 60-69. For example, ICE has a range of monitoring options, including telephonic reporting and GPS monitoring. *Id.* ¶¶ 67-68. Compliance rates with ICE's electronic supervised release program is extremely high: studies have found that 99% of program participants appear for proceedings. *See* Cong. Research Serv., *Immigration: Alternatives to Detention (ATD) Programs* 9 (July 8, 2019), https://fas.org/sgp/crs/homesec/R45804.pdf.

### Respondents' Failure to Adequately Protect Petitioners from COVID-19 Violates Their Due Process Rights

90.    "When the Government detains a person for the violation of an immigration law, the person is a civil detainee, even if he has a prior criminal conviction." *Sallaj*, 2020 WL 1975819, at *3 (quoting *Castillo v. Barr*, --- F. Supp. 3d ----, 2020 WL 1502864, at *3 (C.D. Cal. Mar. 27, 2020)) (in turn citing *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001)). Civil detainees are "entitled to more considerate treatment than a criminal detainee, whose conditions of confinement are designed to punish." *Id.* (quoting *Castillo*, 2020 WL 1502864, at *3) (in turn citing *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). Respondents cannot hold Petitioners and other civil detainees in conditions that constitute punishment. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) ("Due process requires that a pretrial detainee not be punished."); *Zadvydas v. Davis*, 533 U.S. 678, 721 (2001) ("Where detention is incident to removal, the detention cannot be justified as punishment nor can the confinement or its conditions be designed in order to punish.").

---

[38] Hamed Aleaziz, *ICE Moved Dozens of Detainees Across the Country During the Coronavirus Pandemic. Now Many Have COVID-19*, Buzzfeed News, Apr. 29, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/ice-immigrant-transfer-jail-coronavirus.

91.    "The Constitution imposes upon the Government a duty to assume responsibility for a detainee's safety and general well-being while in custody." *Sallaj*, 2020 WL 1975819, at *3 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). The Due Process Clause protects pre-trial and civil detainees from objectively unreasonable conduct that creates a risk to their safety. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015); *see also, e.g.*, *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. County of Orange*, 888 F.3d 1118, 1120, 1122-25 (9th Cir. 2018). The detainee need only prove that, "from an objective viewpoint," the conduct was "'not rationally related to a legitimate governmental objective or that it [was] excessive in relation to that purpose.'" *Miranda-Rivera v. Toledo-Davila*, 813 F.3d 64, 70 (1st Cir. 2016) (quoting *Kingsley*, 135 S. Ct. at 2473-74). Additionally, conditions of confinement for civil immigration detainee violate the Constitution if they do not "reasonably relate[] to a legitimate governmental objective." *Bell*, 441 U.S. at 539 (1979); *accord Lyons v. Powell*, 838 F.2d 28, 29 (1st Cir. 1988).

92.    At the very minimum, "[t]he due process guarantee of the Constitution obliges the government 'to refrain *at least* from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health.'" *See Sallaj*, 2020 WL 1975819, at *3 (emphasis added) (some quotation marks omitted) (quoting *Savino I*, 2020 WL 1703844, at *6) (in turn quoting *Coscia v. Town of Pembroke*, 659 F.3d 37, 39 (1st Cir. 2011)).

93.    Respondents' failure or inability to facilitate social distancing at Wyatt or to implement sufficient sanitation practices violates Petitioners' due process rights. "The risk of contracting COVID-19 in a detention center, such as the Wyatt, is dangerously high." *Sallaj*, 2020 WL 1975819, at *3. "As warned by the CDC, conditions of confinement inherently prevent one's ability to socially distance, which, until a treatment is discovered, or a vaccine developed, is the

best measure to reduce the spread of the disease." *Id.* "Courts around the country are recognizing this fact." *Id.* (collecting cases). "Although the Respondents have asserted that the Wyatt has taken measures to mitigate the risk of Covid-19 spreading, its ability to do so is diminishing." *Id.* This ineffective response in the face of an indisputably grave risk to health and life violates the Due Process Clause. *Id.*

94.     The number of confirmed cases of COVID-19 at Wyatt has grown exponentially since this Court's April 24 order in *Sallaj*, and, as then, "the full extent of the risk is [still] unknown" due to inadequate testing. *See id.* Accordingly, Petitioners here, like Mr. Sallaj before them, have "a likelihood of success on the merits of [their] Fifth Amendment claim because continuing to hold [them] in civil detention at the Wyatt, where COVID-19 is present, could expose [them] to an unnecessary substantial risk of serious harm to [their] health." *Id.*

95.     Stopping the transfer of additional civil immigration detainees to Wyatt and substantially reducing the civil immigration detainee population at the facility are the only means to protect the due process rights of Petitioners and the putative class of all Wyatt immigration detainees.

96.     Respondents have no legitimate or compelling interest in maintaining or increasing the civil immigration detainee population at Wyatt. ICE has a myriad of options—other than physical incarceration—to achieve its purpose of ensuring Petitioners' attendance to immigration court proceedings and compliance with removal and other custodial orders.

### Class Action and Representative Habeas Allegations

97.     Petitioners bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and a class of similarly situated individuals.

98.     Petitioners seek to represent a class of all individuals held in civil immigration detention at Wyatt.

99.     The proposed class satisfies all four prongs of Rule 23(a).

100.    Rule 23(a)(1) is satisfied because the members of the proposed class are so numerous that joinder of all members is impracticable. Upon information and belief, there are approximately 71 ICE detainees currently held at Wyatt. The numerosity requirement imposes only a "low threshold," *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009), such that "a class size of forty or more will generally suffice in the First Circuit." *Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass. 2014).

101.    Joinder is also impracticable because class members are detained and largely unrepresented, limiting their ability to bring individual litigation.

102.    The proposed class meets the commonality requirements of Rule 23(a)(2). Whether current conditions at Wyatt, including the failure to implement social distancing in the face of the COVID-19 pandemic, comply with the Fifth Amendment presents common questions of fact and law.

103.    The proposed class meets the typicality requirements of Rule 23(a)(3) because the representative Petitioners' claims are typical of the claims of their class. Petitioners are currently civil immigration detainees at Wyatt, who are exposed to the current conditions of detention, and at high risk of infection, illness, and death from COVID-19.

104.    The proposed class meets the adequacy requirements of Rule 23(a)(4). Petitioners have the requisite personal interest in the outcome of this action and have no interests adverse to the interests of the proposed class.

105.    Additionally, the proposed class is represented by pro bono counsel from the American Civil Liberties Union, two law professors at Roger Williams University serving as cooperating attorneys of the American Civil Liberties Union of Rhode Island, and the law firm Morgan, Lewis & Bockius, LLP. Petitioners' counsel has extensive experience litigating class

action lawsuits and other complex cases in federal court, including civil rights lawsuits and petitions for habeas corpus on behalf of detained immigrants.

106.    The members of the class are readily ascertainable through Respondents' records.

107.    Finally, the proposed class satisfies Rule 23(b)(2). Respondents have acted or refused to act on grounds generally applicable to the class by detaining class members without social distancing in the face of the COVID-19 pandemic. Thus, final injunctive and declaratory relief is appropriate for the class as a whole.

108.    Alternatively, Petitioners seek certification of the proposed class as a representative *habeas* class. *See United States ex rel. Sero v. Preiser*, 506 F.2d 1115 (2d Cir. 1974). Petitioners seek a writ of *habeas corpus* to remedy their and the class members' unconstitutional detention in life-threatening conditions at Wyatt.

## CLAIM FOR RELIEF

**Violation of Fifth Amendment Right to Due Process**
**(Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement)**

109.    Petitioners reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

110.    The Fifth Amendment requires the federal government to maintain conditions of reasonable health and safety for people in its custody. The government violates this requirement when it fails to provide for their basic human needs, including reasonable safety.

111.    The federal government also violates the Fifth Amendment when it subjects anyone in its custody to cruel treatment, and when it subjects civil detainees to conditions of confinement that amount to punishment.

112.    By detaining Petitioners at Wyatt during the COVID-19 pandemic—and while there is an outbreak of COVID-19 at Wyatt—without implementing appropriate social distancing or hygiene

precautions, Respondents are failing to ensure Petitioners' reasonable safety, exposing them to a risk of infection from the virus that causes COVID-19.  Respondents are thus violating Petitioner's and other putative class members' rights under the Fifth Amendment.

113.     Respondents continue to admit new ICE detainees to Wyatt, in reckless disregard of and deliberate indifference to the dangerous conditions there and the facility's inability to provide minimal protection against COVID-19.

114.     Alternatives to detention are available that would preserve and protect both Petitioners' health and well-being and that of the broader community. Release either on personal recognizance or subject to monitoring or supervision would cause no burden on Respondents and would place Petitioners at substantially lower risk of contracting COVID-19, with all of its attendant threats to health and life.

115.     Respondents are subjecting Petitioners to detention conditions that violate Petitioners' right to reasonable safety in government custody and, accordingly, Respondents' ongoing detention of Petitioners violates the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

Petitioners respectfully ask this Court to:

A.     Certify the Petitioners and all similarly situated civil immigration detainees held at Wyatt as a class, appoint named Petitioners as class representatives, and appoint the undersigned as class counsel;

B.     Order Respondents not to transfer Petitioners or any putative class members to custody outside of this Court's jurisdiction while this action is pending;

C.     Order Respondents not to the transfer additional civil immigration detainees to Wyatt while this action is pending;

D.     Exercise the Court's inherent power to undertake an expedited process for reviewing bail applications for the Petitioners and all putative class members pending a final decision on the merits of their habeas claims;

E.      Declare that conditions of confinement for all noncitizen civil detainees held at Wyatt are currently unconstitutional under the Due Process Clause of the Fifth Amendment;

F.      Issue a Writ of Habeas Corpus on behalf of the Petitioners and all putative class members and order their immediate release or placement in community-based alternatives to detention such as conditional release, with appropriate precautionary public health measures;

G.      Issue injunctive relief ordering the immediate release of Petitioners and all putative class members, or their placement in community-based alternatives to detention, with appropriate precautionary public health measures;

H.      Award Petitioners their costs and reasonable attorneys' fees in this action under the Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and on any other basis justified under law; and

I.      Grant such further relief as the Court deems just and appropriate.

Dated: May 15, 2020                          Respectfully Submitted,

David C. Fathi**
Eunice H. Cho**
American Civil Liberties Union Foundation, National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
T: 202-548-6616
dfathi@aclu.org
ECho@aclu.org

Omar Jadwat*
Michael K.T. Tan*
American Civil Liberties Union Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
ojadwat@aclu.org
mtan@aclu.org

s/ Deborah S. Gonzalez
Deborah S. Gonzalez, Esq., Bar No. 7931
Jared Goldstein*
Roger Williams University School of Law
Cooperating Attorneys, American Civil Liberties Union Foundation of Rhode Island
1 Empire Street, Suite 435
Providence, RI 02903
T: 401-486-7230 (C)
dgonzalez@rwu.edu
jgoldstein@rwu.edu

Susan Baker Manning*
Natalie A. Bennett*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: 202-739-3000
susan.manning@morganlewis.com
natalie.bennett@morganlewis.com

Morgan Russell*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: 415-343-0770
IRP_MR@aclu.org

Lindsey Kaley*
American Civil Liberties Union Foundation,
Center for Liberty
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2500
lkaley@aclu.org

James P. Looby*
Alborz Hassani*
Morgan, Lewis & Bockius LLP
77 West Wacker Drive | 5th Floor
Chicago, IL 60601
T: 312-324-1000
james.looby@morganlewis.com
al.hassani@morganlewis.com

Stephanie Faraci*
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110-1726
T: 617-341-7700
stephanie.faraci@morganlewis.com

*Counsel for Petitioners*

*\*Pro Hac Vice Motion Forthcoming*
*\*\*Pro Hac Vice Motion Forthcoming; not admitted in D.C., practice limited to federal courts*