IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| YANES, et. al, ) | |
|     Plaintiffs ) | |
| ) | |
| V. ) | No. 1:20-cv-00216-MSM-PAS |
| ) | |
| MARTIN, et. al, ) | |
|     Respondents ) | |

# ORDER

The petitioners, immigration detainees at the Wyatt Detention Center in Central Falls, Rhode Island, filed on May 15, 2020, this putative class action habeas petition, claiming that the conditions in which they are confined violate their Fifth Amendment due process rights by subjecting them to substantial risk of severe injury or death from infection with the COVID-19 disease. They seek declaratory and injunctive relief and, in the interim, release or community confinement under precautionary public health measures. (ECF No. 1.)

The most immediate issue now before the Court is the petitioners' motion for expedited individual bail hearings to address whether any, or all, of them should be released pending the conclusion of this action. (ECF No. 15.) The petitioners contend that they are held in conditions that promote, rather than protect them from, infection by the highly contagious corona virus and that they are suffering unconstitutional conditions of confinement.

1

This action was brought as a class habeas,[1] and class certification was provisionally granted. (ECF No. 21.) In this Circuit, district courts have the inherent power to release habeas petitioners on bail if they demonstrate a "substantial question" of constitutional error and "exceptional circumstances." *Glynn v. Donnelly,* 470 F.2d 95, 98 (1st Cir. 1972) (quoting *Aronson v. May,* 85 S.Ct. 3, 5, 13 L.Ed.2d 6 (1964); *Gomes v. U.S. Dept. of Homeland Security, Acting Secretary,* Civil No. 20-cv-453-LM, 2020 WL 2514541 (D.N.H. May 14, 2020)).[2]  *Accord, Mapp v. Reno,* 241 F.3d 221, 226 (2nd Cir. 2001) ("substantial claims and [] extraordinary circumstances"). That is true even for immigration detainees. *Id.* at 27.   In this case it is particularly compelling to at least *consider* bail because the remedy that the petition ultimately seeks – protection from unnecessary exposure to the virus and unnecessary risk of

---

[1] The government contends that habeas corpus relief is not available to challenge conditions of confinement. (ECF No. 32 at 20.) A number of similar actions have proceeded as petitions for habeas corpus in many different federal courts. The government's argument does not persuade this Court. *See, e.g., Savino v. Sousa,* C.A. No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. Apr. 8, 2020) (class action habeas); *Zepeda Rivas v. Jennings*, No. C.A. 20-02731-VC, 2020 WL 2059848 (N.D.Cal. Apr. 29, 2020) (class action habeas); *Coronel v. Decker,* 20-cv-2472 (AJN), 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (group of individual habeas petitioners); *McPherson v. Lamont*, Civil No. 3:20cv534 (JBA), 2020 WL 2198279 (D. Conn. May 6, 2020) (class action habeas). The respondents do not appear to put forth a separate argument that if a habeas action is appropriate, bail pending its resolution is forbidden.

[2] *Glynn v. Donnelly* addressed a far different context than these cases, holding that, in the *absence* of exceptional circumstances, a habeas petitioner *whose conviction and sentence had been fully adjudicated*, must show a "clear case" on both the law and facts. *Id.* at 98. It cited with agreement, however, an opinion of Supreme Court Associate Justice William Douglas noting that the standard for admission to bail pending resolution of a habeas action of such a person must be "greater" than that for someone who was challenging an incarceration "not resulting from a judicial determination of guilt." *Id.* at 98.

2

serious injury or death – would be illusory and, indeed, moot for any petitioner who became sick and suffered major adverse effects or even death as a consequence of confinement during the pendency of the action.

## I. CONSTITUTIONAL CLAIM

The issues presented by this case are at the confluence of two constitutional doctrines applicable to civil detainees. First is the indisputable principle that the government has the obligation to safeguard the physical security of those it incarcerates, to protect them from known risks. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976-77 (1994). The authorities need not know of a precise risk, or foretell precise harm, but they must act to forestall a substantial risk of harm of which they are aware. *Calderon-Ortiz v. LaBoy-Alvarado*, 300 F.3d 60, 65 (1st Cir. 2002). Second, while *Farmer* addressed an Eighth Amendment basis for relief, the Fifth Amendment's due process clause provides protection as well. The due process clause protects a pretrial detainee against "excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473, 192 L.Ed.2d 416 (2015)[3] (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S. Ct. 1865, 104 L.Ed.23 443 (1989)).

---

[3] *Kingsley* appeared to do away, with respect to detainees, with the need to show the subjective state of mind that is a hallmark of the "deliberate indifference" or "reckless disregard" formulations. *Kingsley*, 135 S. Ct. at 2472-73. While the First Circuit has not ruled on this precise issue since *Kingsley*, the *Kingsley* standard of "objective reasonableness" is the appropriate one to be applied to an action like this brought by civil detainees such as the petitioners. That is consistent with the determination of another judge in this district, ruling on a motion for release of specific ICE detainees. *Medeiros v. Martin*, C.A. No. 20-178 WES, 2020 WL 2104897, at *4 (D.R.I. May 1,

3

The petitioners here are held by the government for alleged violations of immigration laws. As such, they are civil detainees who are "entitled to more considerate treatment than a criminal detainee, whose conditions of confinement are designed to punish." *Youngberg v. Romeo,* 457 U.S. 307, 322, 102 S. Ct. 2452, 73 L.Ed.2d 28 (1982). They are entitled, as a matter of substantive due process, to "safe conditions of confinement," and the government has the obligation "to provide reasonable safety for all residents and personnel within the institution." *Id.* at 324

---

2020). In fact, the Court is perplexed by the government's assertion in its filings in this case that the appropriate standard of review is that of "deliberate indifference." In *Medeiros*, the government apparently conceded that the more generous standard of objectively unreasonable is the appropriate standard of review. *Id.* at *10. The respondents have cited *Medeiros* and that exact order with approval at various points in its filing. *See Gomes,* 2020 WL 2514541 at *12 (*Kingsley* standard likely applies to civil detainees' due process conditions of confinement claim).

The First Circuit has recently found the *Kingsley* "objective unreasonableness" standard appropriate for an arrestee's Fourth Amendment excessive force claim, while applying an Eighth Amendment "deliberate indifference" standard to medical care. *Miranda-Rivera v. Toledo-Davila,* 813 F.3d 64, 71 (1st Cir. 2016). *But see Fraihat v. U.S. Immig'n & Customs Enforcement*, Case No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570 at *22 (C.D. Cal. Apr. 20, 2020) (applying "objective unreasonableness" standard to due process claims by ICE detainees about dangerous medical conditions).

In truth, a purely objective reasonableness test and one with a subjective element of "deliberate indifference" are likely to lead to similar places. There can be no real dispute that the respondents are and have been aware of the risks of the virus and its horrifying infectiousness. ICE, the CDC, the White House, and all manner of state and federal agencies have bombarded the public and institutions with warnings. The respondents' conduct at the facility, in taking some precautionary measures but not others, has presumably been intentional. Both formulations look at what the respondents knew, what they did, and what they should have done.

(civil commitment).  "[C]ivil immigration detainees can establish a due process violation by showing that a government official "'knew, or should have known' of a condition that 'posed an excessive risk to health,' and failed to take appropriate action." *Sallaj v. U.S. Immig'n and Customs Enforcement,* C.A. No. 20-167-JJM-LDA, 2020 WL 1975819, at *3 (D.R.I. Apr. 24, 2020) (quoting *Basank v. Decker,* No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020)).

## II.  COVID-19 AND WYATT

It is clear from the evidence produced thus far, and the government's own submissions, that there is at the very least a clear question of substantial risk of serious harm from contagion by the COVID-19 disease, under current conditions at Wyatt.  The dangers of the virus are well-known and, for many months now, have occupied not only the front pages of newspapers across the country, but also the bulk of the inside pages.  Nightly newscasts bring daily reports of more disease, more hospitalizations, more deaths. At this writing, the United States is approaching 1.8M positive cases and has crossed the 102,000 mark in documented fatalities.[4]  The Wyatt facility is located in Rhode Island, where, on March 9, 2020, the Governor declared a state of emergency.  *See* Executive Order 20-02, governor.ri.gov/ documents/orders/Executive-Order-20-02.pdf.  On March 11, the World Health

---

[4] The CDC reported, as of May 31, 2020, total cases of 1,737,950 – of which 21,304 were new since the day before – and 102,785 deaths – of which 1,265 were new.  That number equates to nearly a death per minute.  In the space of the 25 minutes it might take to read this Order, nearly two dozen people nationwide are likely to die from the virus.  https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

Organization declared COVID-19 a global pandemic. https://www.statnews.com/2020/03/11/who-declares-the-coronavirus-outbreak-a-pandemic/. And, on March 13, 2020, a national emergency was declared. Pres. Proc. No. 9994, 85 FR 15337, 2020 WL 1272563 (Pres.). On March 28, 2020, the Governor issued a "Stay at Home" Order requiring residents to stay at home except for work, medical treatments or obtaining necessities. Executive Order 20-14 (also prohibiting gatherings of more than five (5) people in any public or private space).

The Center for Disease Control, the government agency with the most expertise and authority in the area of infectious disease, has warned that the virus spreads from person-to-person primarily from close contact and that many of those infected, and thus contagious, have no symptoms. "The virus that causes COVID-19 is spreading very easily and sustainably between people." https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html. The primary means of protection are threefold: hand-washing and sanitization, staying at least 6' away from all other people in what has come to be called "social distancing," and preventing the primary method of infection from airborne particles by wearing face coverings when in close quarters with other people. Indeed, social distancing and face coverings are not mere suggestions: they are mandated by gubernatorial directive. *See* Executive Order 20-24, issued Apr. 14, 2020, Executive Order 20-30, issued May 6, 2020.

The consequences on daily life of the spread of the virus, and the efforts to prevent further spread, are familiar now to every American, from the elderly whose

6

rate of death in nursing homes is staggering[5] to toddlers who have been forbidden from attending daycare or climbing on the jungle gym in the local park. Restaurants, businesses, entertainment, even public green spaces, became off-limits.[6]

"Congregate living, such as nursing homes, cruise ships, aircraft carriers, and that at Wyatt and other detention facilities and prisons, magnifies the risk of contracting COVID-19." *Medeiros v. Martin*, 2020 WL 2104897, at *2 . *See* CDC *Megan Wallace et al, "COVID-19 in Correctional and Detention Facilities – United States, February-April 2020* ("CDC Detention Report") (May 15, 2020).

Wyatt, like many other facilities, has been endeavoring to modify its conditions to meet the current threat. It has instituted a number of new procedures in response to the health risk. However, even assuming the Respondents' factual assertions about conditions at Wyatt are true – and many have been disputed by the petitioners – there remains a substantial risk of serious harm to the petitioners. The number of cases at Wyatt, in spite of precautionary efforts that have been made, has been

---

[5] Forbes has reported that a stunning 43% of deaths nationwide have occurred in nursing homes. https://www.forbes.com/sites/theapothecary/2020/05/26/nursing-homes-assisted-living-facilities-0-6-of-the-u-s-population-43-of-u-s-covid-19-deaths/#565fc8d374cd

[6] At this writing, Rhode Island has gingerly moved to Stage 2, which reopened some public areas and retail businesses with dramatic restrictions. Rhode Island Governor's Executive Order 20-40, issued May 29, 2020.

steadily increasing.[7]  The number of detainees currently held there is 57[8] requiring some inmates to occupy cells with at least one other – a situation that makes "social distancing" impossible.[9]  Wyatt relies on double-celling and the 5' x 9' size of cells is clearly too small to guarantee at least 6' of separation between cellmates at all times.  The affidavit of Warden Martin asserts that 36 out of 44 detainees housed in J-2 Pod are in single cells, and three others are in single disciplinary cells.[10]  (ECF No. 32-1 at 2.)  Ten detainees in J-1 Pod are not single-celled; they are kept together because they are a "cohort of detainees who must stay together for a prescribed period of time until they can 'clear' through testing."  *Id.*  Mealtimes are congregate, with "1-2 detainees at a 4-person table."  The government provides no information about the

---

[7] Since April 20, 2020, by Order of the Chief Judge of this Court, Wyatt has been filing semi-weekly status reports which, among other items, reveal the number of tests and the results for ICE and criminal detainees.  On April 20th, two tests had been conducted, neither of which was positive.  By the next day, a third detainee was tested, resulting in a positive reading.  As of May 26, 2020, when there were 523 detainees in total, 454 tests had been administered, resulting in 47 positive readings.  All 32 currently active cases in the institution affect non-ICE detainees.  *See In Re: Donald W. Wyatt Detention Center*, No. 1:20-mc-4, April 20 and May 26, 2020 Status Reports (D.R.I.).

[8] *See In Re: Donald W. Wyatt Detention Center*, No. 1:20-mc-4, May 26, 2020 Status Report, at 1 (D.R.I. May 26, 2020)

[9] The primary method of transmission of the virus is through airborne droplets which, the CDC has widely publicized, can travel up to 6' when expelled by a cough or sneeze.  Therefore, every governmental edict concerning gatherings outside residences has included mandates to maintain a "social distance" of at least 6' from other persons.  In addition, those edicts have required face coverings in most public environments where social distancing cannot be guaranteed.

[10] As the respondents note, two of the four named petitioners are now in single cells; two, presumably, are not.  Def.'s Response to Mot. for PI (ECF 36 at 2).

size of the table, but it is extremely unlikely to be 6' x 6', making social distancing impossible during all meals.[11] Further, detainees are required to stand in line to receive meals, a process which also makes social distancing impossible. And, of course, inmates are eating, an activity that precludes them from remaining masked. Exercise time in the yard is congregate; showers, except for quarantined detainees, are congregate. Staff are mingled throughout the institution; there appears to be no attempt to limit the number of different staff with whom detainees come into contact, and staff clearly go in and out of the institution and mix to varying degrees with family and the public.

The Court has inconsistent information with respect to the procedure for accepting new detainees. The government represented to the Court that new detainees were quarantined for 14 days upon entering the institution. The status report indicates that period is 8 days, within which time the new detainee is tested twice; if both tests are negative, he is moved to general population. The period of contagion, however, is uniformly agreed to be 14 days, and, in addition, there is a high rate of false negative tests.

While those over 65 have been singled out for special protection because of the serious adverse effects of the disease, the *risk* of infection knows no age boundaries. The CDC reports as of May 28, 2020, that data from 1,392,310 people (a 99.8% reporting rate) shows that only 11.7% of the cases occur in people over the age of 75

---

[11] The petitioners allege the tables are less than 3' wide, bolted to the floor, with seats that cannot be moved. (ECF No. 1 at 4.)

(163,368 cases). Nearly 4% of the positive results were in children under the age of 18 (53,120 cases). And those in the age brackets of 18 – 44 and 45 – 64 constitute 39.5% (549,902 cases) and 34.3% (478,950 cases) respectively of the infected persons.[12] The *consequence* of infection is thought to be especially severe for those with "known vulnerabilities," such as age, pre-existing respiratory or cardiac conditions or disease, diabetes, obesity, hypertension, and other maladies.[13] Yet there have been many deaths among persons who have no known pre-existing risks.[14] In addition, the ICE immigrant population almost by definition includes undocumented persons, a population that has historically received inconsistent medical attention, so there may well be exacerbating physical conditions among detainees that are simply undiagnosed.[15]

---

[12] These numbers, last checked on May 31, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, are updated every day.

[13] People at special risk are, at a minimum, those who are pregnant, immune compromised, older adults, those with asthma, HIV, liver disease, chronic lung disease, serious heart conditions, severe obesity, diabetes, and chronic kidney disease. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Hypertension has also been implicated as an exacerbating factor, whether alone or in conjunction with other conditions. *Gomes,* 2020 WL 2514541 at *16.

[14] "A study from the CDC showed that even in patients between ages 19-64 with no underlying health conditions, the total hospitalization rate was 8-8.7%. In a different CDC study of hospitalized COVID-19 patients, 26% had no high-risk factors – of that subpopulation, 23% received ICU care and 5% died. *Gomes*, 2020 WL 2514541 at *16 (citations omitted).

[15] Wolbert, "Universal Healthcare and Access for Undocumented Immigrants," 5 PJEPHL 61 (Winter 2011) (for a variety of reasons, including fear of authorities, use of healthcare resources among undocumented immigrants is disproportionately low); Gilcrist, "Undocumented Immigrants: Lack of Equal Protection and Its Impact on

ICE has been under directives to identify all detainees falling into specific risk categories for nearly two months. Peter Berg, the Assistant Director of Field Operations of ICE, on April 4, 2020, listed risk factors and specifically directed Field Office Directors to determine which of the detainees in their area of responsibility met any of those criteria. Covid-19 Detained Docket Review 121-4, issued Apr. 4, 2020. Not long thereafter, a federal judge in the Central Division of California, in a nationwide class action of high-risk detainees, ordered ICE to do the same. *Fraihat v. U.S. Immigr'n and Customs Enforcement,* 2020 WL 1932570 at *20, certified a nationwide class of ICE detainees held in detention facilities across the country who have risk factors or disabilities placing them in a high-risk category. *Id.* at 16. On April 20, 2020, *inter alia*, the court directed ICE to identify those people. *Id.* at 29.

It is clear from even a brief review of the medical records provided by the government in response to this Court's order that this has not been accomplished for the detainees in this case. Most, if not all, detainees brought to the Wyatt facility arrive there without any medical records. Records seem to begin at the date of intake at the Wyatt detention facility. Most are reliant on an oral history given by the detainee upon his arrival and a cursory medical examination. These facts alone, when added to the failure to conduct a thorough medical evaluation – by a doctor and with appropriate diagnostic testing – of each detainee means that the government does not actually know which detainees have underlying medical conditions that put

---

Public Health," 34 J. Leg. Med. 403 (Oct-Dec. 2013) (discussing lack of access to healthcare of undocumented immigrants).

them at extreme risk should they contract COVID-19.

Even more disturbing, the records that *do* exist reveal a number of potentially high-risk individuals who the Respondents have not identified in their filings as being especially vulnerable. For example, a very cursory examination of just a handful of medical records shows that the government records the height and weight of every detainee but fails to calculate whether the Body Mass Index (BMI) denotes obesity, a high-risk category. Several detainees report, and intake nurses note, things such as a history of hypertension. Some include notes of medications these detainees are taking but, again, these individuals have not been labeled "especially vulnerable." At least one detainee, also not identified, is an insulin-dependent diabetic.[16]

The Wyatt Detention Facility is in Central Falls, Rhode Island. Central Falls has the highest per capita rate of Covid-19 infection in the state. As of May 31, 2020 Central Falls had 806 confirmed cases which translates to an infection rate of 3,980 per 100,000 residents; that rate is more than double the state average.[17] The fact that several months into this pandemic and with widespread infection in the

---

[16] The filing of the respondents so contradicts this information as to make the Court wonder if it read the filing correctly. The respondents first acknowledge that one detainee is 69 years old. Beyond that, however, the *only* discussion of heightened risk factors among the detainees is the following:

> The health histories of the detainees are also varied, with many detainee records indicating no medical conditions that would place them at higher risk for COVID-19, one (Petitioner _____) with a record of asthma and several with mental health conditions.

(ECF No. 32, at 11.)

[17] https://ri-department-of-health-covid-19-data-rihealth.hub.arcgis.com/ *See also*; https://www.cnn.com/interavtive/2020/health/coronavirus-us-maps-and-cases/

detention facility and surrounding community, the government has not undertaken any real effort to ascertain the underlying medical conditions of the detainees in this case arguably could arguably to the level of conduct that is both deliberately indifferent *and* objectively unreasonable. *See, e.g., Fraihat,* 2020 WL 1932570 at *24 (finding a month-long delay in determining who among the detainees was high-risk to be objectively unreasonable). Indeed, the lack of that reliable and complete identification has led here to hearings for all detainees, not simply a subgroup.

Thus, the conditions at Wyatt, combined with the fact that COVID-19 is present in the institution, constitute emergency circumstances for every detainee housed there. The Court also notes that the cases that the government cites, from the District of Massachusetts, where the court did not grant bail hearings for each of the detainees, reviewed markedly different conditions than those present in this case. In *Grinis v. Spaulding*, C.A. No. 20-10738, 2020 WL 2300313 (D.Ma. May 8, 2020) (ECF No. 35, Exh. C), the plaintiffs were sentenced inmates required to show a wanton disregard for their safety and an Eighth Amendment violation. The facility in question in that case was a Federal Medical Facility that, presumably, had more resources with which to address medical problems and, as of the issuing of the opinion in that case, had only one prisoner positive for COVID-19. The other case, *Baez v. Moniz*, C.A. No. 20-0753-LTS, 2020 WL 2527865 (D.Ma. May 18, 2020) (ECF No. 35, Exh. B) addressed only the issue of injunctive relief for the entire putative class amid conditions at an institution that had not at that point had a single COVID-19 case.

III.  RELIEF

In order to prevail in their quest for bail hearings the petitioners must show that they have presented a substantial claim of constitutional error, and exceptional circumstances.  That burden is carried by the conditions that Respondents concede are present in the Wyatt detention facility.  These conditions, in the aggregate, combined with the fact that COVID-19 is present at the Wyatt Detention Center, present a case for a substantial claim of constitutional error and present facts which may lead the Court to conclude that their continued detention under these circumstances presents a substantial risk of serious harm or death.

I therefore ORDER that the petitioners will be afforded individual bail hearings, beginning Wednesday, June 3, 2020.  As outlined in my Text Order of June 1, 2020, the following are directed:

    (i) the petitioners will file, on a daily basis by 9 a.m., a list of at least ten (10) detainees for whom they request bail hearings.  In a separate filing under seal, they are to indicate any health vulnerabilities.  That filing may, but need not, contain a written argument in support of release, and/or any specific conditions of release, and may be accompanied by any relevant documents.  The Court, from those lists, will determine scheduling and hopes to conduct at least five (5) hearings each weekday until the requests are exhausted.

    (ii) by 3 p.m. each day, the respondents will file a statement of either agreement or objection to the release of each person on that day's list.  They

may, but need not, file a memorandum under seal discussing their position and/or additional documents. The government may propose specific conditions of release.

(iii) beyond the items specified in (i) and (ii) above, all further discussions relevant to the detainees will take place orally at each hearing.

(iv) respondent Martin is ORDERED to assign Wyatt staff sufficient to facilitate these hearings in the most efficient manner possible.

(v) at these hearings, the parties will address all relevant considerations, including any special characteristics of the detainee relative to medical risks, his criminal and immigration history, the danger if any to public safety presented by the release of that particular detainee, and the specific petitioner's plan for release.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge
June 2, 2020