DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR
ALAN GREENBAUM

Pursuant to 28 U.S.C. § 1746, I, Alan Greenbaum, an Assistant Field Office Director for U.S. Department of Homeland Security, United States Immigration and Customs Enforcement, Enforcement and Removal Operations, Burlington, Massachusetts, declare under penalty of perjury as follows:

1. Since August 2017, I have been an Assistant Field Office Director ("AFOD") for the U.S. Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE") and its division of Enforcement and Removal Operations ("ERO"). I have worked in other positions within ICE and its predecessor, the former Immigration and Naturalization Service, since 1988.

2. In my official duties as an AFOD in Burlington, Massachusetts, I am responsible for managing the detention of individuals in order to initiate removal proceedings or to effectuate removal orders and for scheduling and execution of removal orders for detained aliens in ICE custody in the ERO Boston area of responsibility ("AOR"). I am familiar with ICE policies and procedures for detaining individuals as well as releasing individuals from ICE custody. I am also familiar with ICE policies and procedures for executing removal orders of aliens with final executable orders of removal who are not held in custody.

3. I write this declaration to provide the Court with additional information as to the transfer and removal process for individuals with final orders of removal and to provides updates to the Court as to the prior transfer and removal of individuals from Wyatt.

4. On May 20, 2020, I provided a declaration as to the planned transfer and removal process for 16 individuals with final orders of removal who were detained at Wyatt.

1

5. As set forth in the below table, 13 of those individuals' removal orders were effectuated in the manner I described in my May 20, 2020 declaration. Three individuals were not transferred from Wyatt on May 26, 2020 as planned due to travel documents not arriving in time for such transfer. Those three detainees, however, were transferred from Wyatt on June 9, 2020 after ICE obtained the necessary travel documents to effectuate removal, as discussed below.

| NAME | DATE REMOVED FROM WYATT | EXPECTED DATE OF REMOVAL FROM U.S. | ACTUAL DATE OF REMOVAL FROM U.S. |
|---|---|---|---|
| Aponte-Jimenez, Jose Alberto | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Arias, Rafael Danillo | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Catalino-Arias, Alfredo | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Cortorreal, Cesario | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| DeJesus Sanchez, Epifanio | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Diaz-Carela, Camepo Armando | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Dzib-Medina, Antonio Jesus | 5/26/2020 | 5/26/2020 | 5/26/20 |
| Lara-Baez, Pedro Luiyi | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Miranda, Willian | 5/26/2020 | 5/28/2020 | 5/28/2020 |
| Pena-Tejada, Joel Alberto | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Pichardo Perez, Alejandro | 5/26/2020 | 6/2/2020 | 6/2/2020 |
| Sales, Marcelo | 5/26/2020 | 5/28/2020 | 5/28/2020 |
| Viera, Rodolfo De Araujo | 5/26/2020 | 5/28/2020 | 5/28/2020 |

6. An additional detainee, identified to the Court in prior filings, was removed from the United States by land transport from Wyatt to the Canadian border, also in the manner I described in my May 20, 2020 declaration.

| NAME | DATE REMOVED FROM WYATT | EXPECTED DATE OF REMOVAL FROM U.S. | ACTUAL DATE OF REMOVAL FROM U.S. |
|---|---|---|---|
| McBride, Edward | 6/5/2020 | 6/5/2020 | 6/5/2020 |

7. On June 9, 2020, ICE transferred an additional 8 individuals with final orders of removal from Wyatt in order to begin the process of effectuating their final orders of removal. The transfer of such individuals occurred in the manner as described in my May 20, 2020 declaration. This group included the 3 detainees originally slated for departure from Wyatt on May 26, 2020, whose departure was delayed. These 8 individuals are listed below:

| NAME | DATE REMOVED FROM WYATT |
|---|---|
| Andujar-Ruiz, Jairo Samuel* | 6/9/2020 |
| Baez Lopez, Wendell Rafael | 6/9/2020 |
| Estrella, Genaro Antonio* | 6/9/2020 |
| Martinez-Ruiz, Marcos | 6/9/2020 |
| Reyes-Castro, Wilberd* | 6/9/2020 |
| Sanchez, Francis Elieser | 6/9/2020 |
| Soto-Arias, Luis | 6/9/2020 |
| Vasquez, Yelman Jose | 6/9/2020 |

* Originally scheduled for 5/26/2020 departure from Wyatt.

8. The above 8 individuals are scheduled for removal flights to their home countries within the next week.

**ICE LIMITATIONS ON ABILITY TO REMOVE INDIVIDUALS NOT IN CUSTODY AND PROCEDURES FOR SELF-DEPARTURE**

9. ICE utilizes both commercial air carriers and charter air carriers to effectuate removals from the United States. Charter flights to foreign destinations depart the United States from designated staging locations in the United States. ICE also utilizes charter air carriers to operate domestic transfer missions which pick up detainees at various locations around the country and deliver to staging points.

10. ICE reviews the individual circumstances of each alien subject to a final order of removal to determine the most effective and timely manner in which to effectuate a final order of removal from the United States.

11. For a detained alien with a final order of removal, ICE will seek to maintain such individual in detention until removal can occur for the reasons set forth below.

12. Per 8 U.S.C. § 1231(a)(2), ICE is prohibited from releasing an alien with a final order of removal from detention while the alien is within the 90 day "removal period." ICE is also directed under 8 U.S.C. § 1231(a)(1)(A) to remove detained aliens with final orders of removal within a period of 90 days. Therefore, if ICE is able to maintain an individual it its custody until the time of removal, it endeavors to do so.

13. An alien who has been released from ICE custody, cannot simply show up and board a charter flight to effectuate transfer or removal, and immediate transfer upon re-entry of custody is not practicable, particularly where a detainee has any pre-existing medical conditions.

14. Among other issues, detainees traveling on ICE charter transfer flights to staging locations must be in custody over 72 hours to permit a medical screening and a tuberculosis (TB) test conducted prior to transfer. If the TB test is positive, a chest x-ray is required to show no active disease. Prior to transfer, a transfer medical summary (TMS) must be completed showing TB clearance, any known medical conditions, a list of medications, and the fact that individual is accompanied with a sufficient supply of medications to last 21-30 days.

15. An individual re-entering ICE custody for removal also presents concerns as it relates to the COVID-19 pandemic owing to possible exposure to COVID-19 while released into the public, creating a risk to other detainees and ICE personnel.

16. Additionally, ICE conducts COVID-19 symptom checks at detention facilities immediately prior to transfer from the detention facility; this is not possible for a non-detained individual who would be appearing from a non-detained location to seek to board a charter transfer flight.

17. Further, seats on ICE charter flights are generally limited and are typically reserved for individuals in ICE custody. ICE therefore has limited ability to guarantee a specific departure date for an individual who was not in ICE custody on a flight manifest for a seat on a charter aircraft as priority is given to those in ICE custody.

18. Finally, if an alien fails to present himself for transfer and removal, ICE would be required to dedicate significant resources to apprehend and re-detain such alien. The alien might then be required to spend additional time in detention until transfer and removal can be accomplished, especially if removal is to a country in which removal flights are not frequent.

19. In sum, if the Court were to order an individual to be released from ICE custody and order such individual to appear for a charter transfer flight to a staging facility prior to removal, while ICE would seek to accommodate such order, there would be a significant risk that such individual would not be able to board the flight for the reasons set forth above.

**OPTIONS OTHER THAN CHARTER FLIGHT REMOVAL ARE LIMITED UNDER PRESENT CIRCUMSTANCES**

20. If ICE is unable to transfer an alien via charter aircraft to the facility in which staging is scheduled for the ultimate charter removal flight, ICE would be forced to transfer the alien via commercial air carrier under escort from ICE officers. ICE seeks to avoid transferring aliens via commercial air carrier, particularly during current conditions, for a number of reasons. First, the cost is more expensive as ICE must purchase a plane ticket for the alien and the ICE officers required for the transport. Second, the commercial air carrier flight would not be staffed by an Immigration Health Service Corps (IHSC) flight nurse as are all charter transfer and removal flights. Third, ICE does not have the ability to ensure all persons aboard the commercial flight are

5

wearing surgical masks and have been symptom screened and temperature checked prior to boarding such flight. Fourth, ICE officers at the arrival destination would also need to be available in order to meet the traveling alien and ICE escort officers and to transport the traveling alien to the staging facility.

21. ICE typically does not release detainees on an order of recognizance or supervision and simply instruct them to depart the country.

22. ICE does coordinate departure plans with some aliens for witnessed departure from the United States. In general, these are non-criminal aliens who have not previously been detained and have complied with orders of recognizance or supervision and who are not considered to be dangers to the community or flight risks. Additionally, such an alien must have a valid travel document and must have the financial means to depart the United States via a commercial aircraft.

23. For a departure plan, ICE requires the alien to provide the following 30 days prior to departure: an itinerary departing a local airport with no stops in the United States, a valid passport, and valid visas for any transit countries (if needed). ICE also requires placement of a GPS monitor on the alien prior to departure. ICE will coordinate with the alien to meet at the airport, remove the GPS monitor, and witness the departure.

24. Due to the current and ongoing COVID-19 pandemic the availability of routine commercial flight routes departing the United States to international destinations is severely limited.  As such, an individual may not currently be able to depart the United States via a commercial airline even if such individual had a valid passport and means to purchase a plane ticket from the United States.

25. Other considerations that exist for ICE when seeking to schedule removal for aliens via commercial removal air carrier include the fact that some countries limit the number of deportees arriving per week and transit countries often place restrictions on deportees as well. ICE is best

able to effectuate removals utilizing its charter network, to locations where commercial carriers cannot yet land or where international agreements prohibit deportation via commercial carriers.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on the Ninth day of June, 2020

_____

Alan Greenbaum
Assistant Field Office Director
U.S. Department of Homeland Security
United States Immigration and Customs Enforcement
Burlington, Massachusetts