## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

OSCAR YANES, et al.,

      *Petitioners-Plaintiffs,*

v.

DANIEL W. MARTIN, et al.,

      *Respondents-Defendants.*

Civil Action No. 1:20-cv-00216

## PETITIONERS' RESPONSE IN OPPOSITION TO FEDERAL RESPONDENTS' MOTION TO DECERTIFY THE PROVISIONAL CLASS, DENY FURTHER CLASSWIDE RELIEF, AND DISMISS THE PETITION

## INTRODUCTION

Even before this Court finished a nearly month-long bail process to reduce the ICE detainee population at Wyatt due the danger posed by COVID-19, the government moved to decertify the class, dissolve the class bail order, and deny further relief. Dkt. No. 271 ("Mot."). In the midst of a devastating resurgence of COVID-19 caused in part by premature re-openings and slackened vigilance, the government's position endangers detainees and the larger community.

The government argues that the decreased number of confirmed COVID-19 cases at Wyatt and the lower detainee population achieved through this litigation renders the class unnecessary. Identified confirmed cases at Wyatt have declined in recent weeks, but so has testing at the facility. There is still no systemic testing of Wyatt staff.  New cases in Rhode Island overall are now rising again from their low at the end of June.[1] Meanwhile, ICE has reversed its most important measure to reduce crowding, by rescinding its suspension on admitting new detainees to Wyatt. The agency has been steadily undoing the critical reduction in population achieved by this Court last month. It is specifically transferring detainees from state institutions with active outbreaks into Wyatt. Nor does it appear that ICE is doing anything to better identify medically vulnerable detainees. Moreover, Wyatt's latest status reports indicate that detainees have not received essential facemasks, gloves, and soap for almost two months, and Wyatt's warden acknowledges that detainees are still instructed to sit two each at small tables while they eat meals.

The Court should not permit the gains of its time-intensive bail process to unravel. Instead, the Court should solidify the progress made by fully certifying the class, entertaining bail

---

[1] *See* Sarah Mujahid July 15 Decl., Exh. A, Providence Journal, July 13, 2020 ("There were 67 patients with coronavirus in Rhode Island hospitals on [July 11], . . . up from 61 three days earlier. . . . In addition to the increase in hospitalizations, the seven-day average of new cases now stands at 55, its highest point since June 19. The number of new cases reported on [July 11], 78, was highest in a single day since June 12."); *id.*, Exh. B, Providence Journal, July 15, 2020 ("The seven-day average of new cases rose for the fifth day in a row, to 64.3."). Exhibits to the attached declaration of Sarah Mujahid are hereafter referred to simply as "Exh."

applications from new class members, and issuing a preliminary injunction that locks in place the present status quo and prevents further increase in Wyatt's ICE population. If "the Court stay[s] its hand" now, it seems inevitable "that the gains in density reduction achieved through the bail orders would be [further] jeopardized by new arrivals." *Savino v. Souza*, --- F. Supp. 3d ----, 2020 WL 2404923, at *2 (D. Mass. May 12, 2020) ("*Savino II*").

## ARGUMENT

## I.   None of Petitioners' Requests for Classwide Relief Are Moot.

Neither dismissal nor denial of any aspect of Petitioners' petition or motions for relief on the basis of mootness is warranted. ICE has resumed transferring new class members into Wyatt, and Petitioners' motion to preliminary enjoin such admissions remains pending.[2]

The Court began bail hearings on June 3. By June 26, the Court had held one or more bail hearings for every member of the class then detained at Wyatt.[3] Throughout that period, ICE reportedly suspended all admissions of ICE detainees into Wyatt from elsewhere. Dkt. No. 32-3, Greenbaum May 26 Decl., ¶ 29. As the government notes, there were 21 ICE detainees at Wyatt as of its June 24 motion. Mot. 2. However, on June 28—just two days after the last bail hearing by Magistrate Judge Sullivan, and without notifying the Court—ICE lifted its "temporary suspension of transferring or placing new detainees at the Wyatt facility." Dkt. 319-1, Greenbaum July 13 Decl., ¶ 5. Since then, ICE has steadily transferred additional detainees into Wyatt. *See* Dkt. Nos.

---

[2] The Court has also not yet ruled on Petitioners' motion to preliminarily enjoin transfers out of Wyatt for non-removal purposes, other than to require that the government provide 48-hours' advance notice of intended transfers. Dkt. No. 17, May 19 Order. However, the government appears to have treated this as a "restrict[ion] on the general transfers of detainees out of Wyatt to other facilities" for non-removal purposes, *see* Mot. 4, and such outward transfers have not been an issue thus far.

[3] The most recent bail hearing was held on June 26 by Magistrate Judge Sullivan. Only one bail application remains outstanding as of this filing: the Court held bail hearings concerning class member Brian Buhamiizo on June 11 and June 23, but has not yet ruled on his renewed application. *See* Minute Entry, June 23, 2020; Dkt. No. 315, June 23 Hearing Tr., at 28; Dkt. No. 303, June 11 Hearing Tr., at 64-67.

289, 290, 319. As of July 13, there are 30 ICE detainees at Wyatt, a 43% increase in population from the 21 detainees when this Court completed the previous bail hearings on June 26. *See* Exh. C, July 13 Status Report, at 1. Class counsel have begun consulting with the new class members concerning requests for bail. In light of the government's own actions in expanding the class, Petitioners' the classwide bail process clearly is not moot.[4]

Petitioners' request for an injunction against precisely the sort of transfers into Wyatt that ICE has resumed plainly is not moot either. On that issue, the government's May 26 opposition brief asserted that "[s]uch an injunction would prevent ICE from effectively enforcing immigration law," and noted that the *Gomes* court declined to grant a similar request. *Id.* at 21. As Petitioners explained in their May 28 reply brief, however, it is clear that no statute bars the Court from entering such an injunction. Indeed, the *Savino* court did just that. Dkt. No. 42, at 3-4; *see Savino II*, 2020 WL 2404923, at *11 (ordering that "[n]o new immigration detainees may be admitted to Bristol County House of Correction"); *see also id.* at *4 ("[T]he Court's preliminary injunction simply . . . halts admissions of new detainees to a particular facility, [a] matter[] as to which the immigration statutes are silent.").

## II.     The Court Should Fully Certify, Rather than Decertify, the Class.

The Court should deny the government's motion to decertify the provisional class and instead grant final certification. Although this Court may alter or amend its order granting provisional class certification "before final judgment," Fed. R. Civ. P. 23(c)(1)(C), "[o]n a motion to decertify a previously certified class, '[d]oubts regarding the propriety of class certification should be resolved in favor of certification.'" *Donovan v. Philip Morris USA, Inc.*, Civ. No. 06-12234-DJC, 2012 WL 957633, at *4 (D. Mass. Mar. 21, 2012); *see also, e.g.*, *In re Vivendi*

---

[4] Even if otherwise moot, Petitioners' requested continuation of the bail process would fall within the "inherently transitory" mootness exception for the reasons discussed below with respect to class typicality. *See infra* note 5.

*Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571 (RJH) (HBP), 2009 WL 855799, at *3 (S.D.N.Y. Mar. 31, 2009) (Decertification "should only be done where defendants have met their 'heavy burden' of proving the necessity of taking such a 'drastic' step.").

The class still easily meets the certification requirements. The government does not argue that the provisional certification was not "appropriate when made." *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 (2013) (internal quotation marks omitted). Instead, the government repeats arguments this Court has already dispatched with and relies on the reduced class size this Court effected, even as ICE has begun undoing that work.

**A.     The Class Still Satisfies the Numerosity Requirement.**

The numerosity requirement presents "a relatively 'low threshold,' which does not impose a precise numerical requirement." *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011) (quoting *Garcia-Rubiera v. Calderon*, 570 F.3d 443, 460 (1st Cir. 2009)). Repeatedly, "courts within this circuit have certified classes with sizes similar to that presented here." *See In re Nexium (Esomeprazole) Antitrust Litig.*, 296 F.R.D. 47, 51-52 (D. Mass. 2013) (collecting cases certifying classes of 20 to 25 members). The government urges decertification based largely on the fact that there were only 21 class members at Wyatt when it filed its motion on June 24. Mot. 14-15. That argument fails for three reasons.

First, "as of July 13, 2020, there [were] 30 ICE detainees at Wyatt, with an expected reduction to 29 on July 14" due to a planned removal. Dkt. No. 319-1, Greenbaum July 13 Decl., ¶ 10. With at least 29 class members, Petitioners meet the numerosity requirement, because the general 40-member "threshold may be relaxed when a party seeks only declaratory or injunctive relief," as Petitioners do here, "since the inclusion of future members increases the impracticability of joinder." *Reid v. Donelan*, 297 F.R.D. 185, 189 (D. Mass.), *enforcement granted,* 64 F. Supp.

3d 271 (D. Mass. 2014) ("*Reid I*") (citing *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).

Second, this Court provisionally certified a class of "civil immigration detainees at the Wyatt Detention Center who are currently held there *or will be held there during the pendency of this action*." Dkt. No. 21, May 20 Order (emphasis added). Thus, in assessing numerosity, the Court must consider that, under ICE's current practices, "an influx of future members will continue to populate the class." *Reid I*, 297 F.R.D. at 189. In the first two weeks after lifting its prior suspension on external admissions, the government has already added nine new class members. The fact that new "members will join the class at indeterminate points in the future[] make[s] joinder *impossible*." *Id.* (emphasis in original); *see also Doe v. Comm'r, N.H. Dep't of Health & Human Servs.*, No. 18-CV-1039-JD, 2020 WL 2129717, at *5 (D.N.H. May 4, 2020).

Third, even if "the size of the . . . class alone does not establish a clear case for numerosity, the Court considers non-numeric factors to determine whether joinder of . . . members is impracticable." *In re Nexium*, 296 F.R.D. at 52. As in *Reid*, many of the class members here "do not speak English, a majority do not have counsel, and most are unlikely even to know that they are members of the proposed class." *Reid I*, 297 F.R.D. at 189; *see also Fraihat v. ICE*, --- F. Supp. 3d. ----, 2020 WL 1932570, at *17 (C.D. Cal. Apr. 20, 2020) ("Given the many obstacles to accessing counsel during the COVID-19 pandemic, the Court is concerned that many putative class members would not be able to proceed on their own, a fact which further highlights the impracticability of joinder."); *Green v. Johnson*, 513 F. Supp. 965, 975 (D. Mass. 1981) (finding numerosity after considering "the fact that the inmate population at these facilities is constantly revolving"). Thus, "adjudicating the . . . claims as a class action would promote judicial economy by avoiding the potential for a series of highly similar individual actions." *See Michaud v. Monro*

5

*Muffler Brake, Inc.*, No. 2:12–cv–00353–NT, 2015 WL 1206490, at *2 (D. Me. 2015) (certifying class of 23 members)

### B.      The Class Still Satisfies the Commonality Requirement.

In asserting that "questions of law or fact" are not "common to the class," Fed. R. Civ. P. 23(a)(2), the government renews arguments this Court previously rejected. Petitioners have consistently shown that class members meet this requirement because they are subject to common conditions and policies at Wyatt. They are civil immigration detainees at risk of exposure to COVID-19 in the same facility, and their due process claims "depend upon a common contention." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The government argues that any further relief will turn on individualized circumstances, Mot. 15-16. But granting bail *hearings* did not reveal variances relating to class members' health status, criminal or immigration histories, or proposed conditions of release. It was known in advance that there would be such differences, and they do not defeat commonality. *See Reid I*, 297 F.R.D. at 190 (commonality satisfied where "[t]he question raised . . . [was] not whether any individual detainee [was] entitled to release on bail," but a question "purely of law, resolvable irrespective of [factual] distinctions" between detainees). Indeed, this Court's decision to afford individual bail hearings to class members was based on the common "*conditions* . . . for every detainee housed [at Wyatt]." Dkt. No. 59, June 2 Order, at 13 (emphasis added). The government identifies no individualized variance in those common conditions.

As in *Reid*, the bail process here turns on a common legal question: the existence of a substantial due process question. *Cf. Reid*, 297 F.R.D. at 189 ("[T]he sole question . . . is whether an individual detainee has a due process right to *argue* for . . . release.") (emphasis in original). And, as in *Reid*, the "distinctions [the government] highlight[s] . . . are irrelevant to the [C]ourt's

ruling on the issue of class certification." *Id.* at 190; *accord Reid v. Donelan*, No. CV 13-30125-PBS, 2018 WL 5269992, at *5 (D. Mass. Oct. 23, 2018). This Court previously rejected the arguments the government now resurrects, and called on Respondents to distinguish *Reid*. *See* May 20, 2020 Tr. at 10:22–11:2, 15:1–7. The government's motion does not mention *Reid*, and again fails to demonstrate lack of commonality.[5]

### III. The Court Should Entertain Bail Requests from New Class Members, and Should Enter Preliminary Injunctive Relief to Preserve the Status Quo and Secure the Gains Achieved through the Court's Bail Process.

The Court should also reject the government's argument that consideration for bail is not warranted for the "new detainees[s] transferred to Wyatt" since the last bail hearings were completed, and that "any further classwide relief should be denied." Mot. 16-18.

#### A. Applicable Legal Standards

The government repeatedly invokes a subjective deliberate indifference standard akin to "criminal recklessness" to argue for the denial of further classwide relief. *See* Mot. at 5, 9-12, 18. This Court has ruled that a "purely objectively reasonableness test" applies, such that Petitioners "can establish a due process violation by showing that a government official knew, or should have known of a condition that posed an excessive risk to health,' and failed to take appropriate action."

---

[5] The government argues in a footnote that the named class representatives do not satisfy the typicality requirement because they are no longer at Wyatt. Mot. 15 n.10. But all three were at Wyatt when the class was provisionally certified, where they were subject to the same conditions as the others and found to be typical of the class. Dkt. No. 21, May 20 Order. That they have since been released or removed "does not pose a problem" for typicality because "the 'inherently transitory' exception to the mootness doctrine was designed for precisely this situation." *See Reid I*, 297 F.R.D. at 192. *Id.* Where it is "by no means certain that any given individual, named as a plaintiff" will be in "custody long enough for a district judge to certify a class," the mootness of the named representative's claims does not defeat class certification—particularly where, as here, "the constant existence of a class of persons suffering the deprivation is certain." *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 398 (1980); *Salazar v. King*, 822 F.3d 61, 74 (2d Cir. 2016) (applying inherently transitory exception where average class member's claim was live for three months); *Brito v. Barr*, 395 F. Supp. 3d 135, 146-47 (D. Mass.), *modified*, 415 F. Supp. 3d 258 (D. Mass. 2019). It is impossible to know how long any class member will be detained at Wyatt, especially where they are able to seek interim release on bail. "It would be anomalous to remove a plaintiff from a case where he files [motions for individual relief and to represent a class] within the same period of time, simply because the court moves expeditiously to provide individual relief." *Reid I*, 297 F.R.D. at 192.

Dkt. No. 59, June 2 Order, at 3-5 & n.3 (internal quotation marks omitted).

"In this Circuit, district courts have the inherent power to release habeas petitioners on bail if they demonstrate a 'substantial question' of constitutional error and 'exceptional circumstances.'" *Id.* at 2 (quoting *Glynn v. Donnelly*, 470 F.2d 95, 98 (1st Cir. 1972)); *see also, e.g.*, Order, *Hernandez Roman v Wolf*, Nos. 20-55436 & 20-55662, Dkt. No. 9 (9th Cir. July 8, 2020) (denying stay of district court's "orders that allowed individualized bail determinations of immigration detainees who sought release because of exposure to and risk of contracting COVID-19," and collecting cases showing that such "orders are consistent with the proceedings utilized by other district courts").

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). "The court's interim injunctive decree attempts to prevent further injury by maintaining the status quo, thus enhancing the court's ability, if it ultimately finds for the movant, to minimize the harmful effects of the defendant's wrongful conduct." *Id.* (citation omitted).

B.    **Current Circumstances Warrant Continued Bail Hearings and a Preliminary Injunction Barring Outside Admissions.**

The government argues that "any further classwide relief should be denied . . . because the conditions at the heart of Petitioner's constitutional claim have . . . changed." Mot. 16. It appears that the government's argument is directed solely at the bail process. As explained above, the Court has yet to rule on Petitioners' motion for a preliminary injunction as to transfers into Wyatt. However, despite addressing the preliminary injunction standard, *id.* at 9, the government makes no argument as to that request for injunctive relief, and makes no argument as to any of the

injunction-specific equitable factors. *See generally* Mot.[6] It instead asserts only that "there is no longer justification to presume . . . that every existing or new ICE detainee at Wyatt should immediately be *considered for release*." *Id.* at 18 (emphasis added).[7] Although its motion is thus apparently aimed only at preventing further detainees from seeking bail, the government does not address the "substantial [constitutional] question" and "exceptional circumstances" factors that govern the bail analysis. *See* Dkt. No. 59, June 2 Order, at 2, 14.[8]

In any event, conditions at Wyatt continue to justify both the Court's consideration of bail requests by any new detainees who wish to make them and preliminary injunctive relief to preserve the status quo and secure the achievements made to date by the Court's bail process. In its June 2 order, this Court's conclusion that Petitioners have raised a substantial claim of constitutional error followed from the inherently "magnifie[d] . . . risk of contracting COVID-19" at a congregate detention facility, *id.* at 7, and the following Wyatt-specific considerations:

- confirmed COVID-19 cases among non-ICE Wyatt detainees, *id.* at 7-8 & n.7;
- an ICE population that exceeded the available single cells, *id.* at 8;
- congregate meals in which "social distancing is impossible," *id.* at 8-9;
- congregate exercise time and showers, *id.* at 9;
- apparent circulation of Wyatt staff "throughout the institution," *id.*;
- "inconsistent information" on whether new detainees quarantined for 14 days, *id.*; and
- ICE's "clear" failure to "undertake[] any real effort to ascertain the underlying medical conditions of [its Wyatt] detainees," in violation of the agency's own directives and the *Fraihat* injunction, *id.* at 12-13.

---

[6] Petitioners thus respond here only to the government's present argument concerning the constitutional merits, which is relevant to both bail and injunctive relief. Petitioners' arguments concerning the remaining preliminary injunction factors—irreparable harm, balance of hardships, and public interest—are set forth in their prior briefing in support of a preliminary injunction. *See* Dkt. No. 15-1 at 30-32; Dkt. No. 42 at 17-19. As to bail, the government has not contested the continued existence of exceptional circumstances. *See generally* Mot.

[7] *See also* Mot. 12 ("[A] new detainee seeking release based on his individual health history, risk to the community, and flight risk [ ] will require a very individualized analysis of the relief requested."); *id.* at 13, 15 (similar).

[8] The government appears to misapprehend the sort of constitutional analysis the Court has undertaken thus far. For example, the government asserts that "this Court . . . concluded that it was constitutionally permissible to keep a 69-year-old indisputably high-risk detainee held at Wyatt." Mot. 17. But the Court has not ruled as to whether it is constitutionally permissible for Mr. Farrier or any other detainee to be held at Wyatt during the pandemic. Rather, the Court ruled that Petitioners had "presented a substantial claim of constitutional error, and exceptional circumstances." Dkt. No. 59, June 2 Order, at 14. The Court then exercised its inherent authority to hear Mr. Farrier's request for bail during the pendency of this class habeas action, and declined to grant bail in light of concerns regarding danger to the community and risk of flight. *See* Minute Entry, June 8, 2020.

The government asserts that "the Court's legal analysis going forward must change" in light of the circumstances described in new declarations from Wyatt's Warden Martin and Health Services Administrator LaBonte and its most recent status report. Mot. 16. These documents show developments on some factors that guided the Court's earlier determination. *See id.* at 17. As of July 13, there were no *confirmed* active COVID-19 cases at Wyatt, and it appears the facility has clarified the length of its quarantine process. Exh. C, July 13 Status Report, at 1. But the critical reduction in the ICE population was achieved by and in response to the Court's bail process, not by the government or Wyatt. And ICE has taken a major step backward by rescinding its suspension of admissions into the facility. Moreover, these latest declarations and status reports largely do not resolve the other concerns that drove the Court's prior ruling.

### 1. Number of Confirmed Active Cases

The absence of confirmed active COVID-19 cases at Wyatt as of July 13 does not eliminate the constitutional question or the merits of the Petitioners' Fifth Amendment claim. The *Savino* and *Gomes* courts commenced the bail process despite the absence of any confirmed cases in the facilities. *Savino v. Souza*, --- F. Supp. 3d ----, 2020 WL 1703844, at *2 (D. Mass. Apr. 8, 2020) ("*Savino I*"); *Gomes v. DHS*, --- F. Supp. 3d ----, 2020 WL 2514541, at *5 (D.N.H. May 14, 2020). The *Zepeda Rivas* court did the same. *Zepeda Rivas v. Jennings*, ---F. Supp.3d ----, 2020 WL 2059848, at *3 (N.D. Cal. Apr. 29, 2020). Indeed, courts throughout the country have repeatedly ordered ICE detainees released on the basis of the inherent risks posed by COVID-19 in facilities with no confirmed cases.[9]

---

[9] *E.g., Xochihua-Jaimes v. Barr*, 798 F. App'x 52 (9th Cir. 2020); *Pimentel-Estrada v. Barr*, --- F. Supp. 3d ----, 2020 WL 2092430 (W.D. Wa. Apr. 28, 2020); *Hernandez v. Kolitwenzew*, No. 2:20-cv-02088-SLD, Dkt. No. 12 (C.D. Ill. Apr. 23, 2020); *Kaur v. DHS*, No. 2:20-cv-03172-ODW (MRWx), 2020 WL 193986 (C.D. Cal. Apr. 22, 2020); *Singh v. Barr*, No. 20-cv-02346-VKD, 2020 WL1929366 (N.D. Cal. Apr. 20, 2020); *Zaya v. Adducci*, No. 5:20-cv-10921-JEL-APP, 2020 WL 1903172 (E.D. Mich. Apr. 18, 2020); *Amaya-Cruz v. Adducci*, No. 1:20-cv-789, 2020 WL 1903123 (N.D. Oh. Apr. 18, 2020); *Vazquez Barrera v. Wolf*, --- F. Supp. 3d ----, 2020 WL 1904497 (S.D. Tex. April

Moreover, the decline in *identified* cases among detainees since mid-June has corresponded to a steady and marked decrease in detainee testing over the same period. After reportedly testing all detainees between June 11 and June 18, Wyatt appears to have tested fewer than 21% (103 of 493 detainees) between June 18 and June 25; fewer than 15% (76 of 509) between June 25 and July 2; fewer than 10% (50 of 513) between July 2 and July 9; and fewer than 7% (36 of 526) between July 6 and July 13. *See* June 22 to July 13 Status Reports) *In re Donald W. Wyatt Detention Ctr.*, 1:20-mc-00004-JJM (D.R.I.), Dkt. Nos. 22 to 28; *cf. Sallaj v. ICE*, C.A. No. 20-167-JJM-LDA, 2020 WL 1975819, at *3 (D.R.I. Apr. 24, 2020) ("[T]he full extent of the risk is unknown because, as of today, only sixty-eight detainees have been tested out of the five hundred eighty-one being held at Wyatt."); Exh. D, CDC, Overview of Testing for SARS-CoV-2, July 2, 2020, at 3 (recommending both "initial testing of everyone" but also "periodic (e.g., weekly) testing of everyone" in congregate "settings with vulnerable populations in close quarters for extended periods of time"). The government offers no evidence that a single ICE detainee has been tested since mid-June.[10]

In short, as the *Savino* court recognized, "'just as '[an] increased rate of infection' does not itself prove [a Fifth Amendment violation], the absence of known infections does not disprove [such a violation]." *Savino v. Souza*, No. CV 20-10617-WGY, 2020 WL 3529664, at *5 (D. Mass.

---

17, 2020); *Fofana v. Albence*, --- F. Supp. 3d ----, 2020 WL 1873307 (E.D. Mich. Apr. 15, 2020); *Ixchop Perez v. Wolf*, No. 19-cv-05191, 2020 WL 1865303 (N.D. Cal. Apr. 14, 2020); *John Doe v. Barr*, No. 3:20-cv-02141-LB, 2020 WL 1820667 (N.D. Cal. Apr. 12, 2020); *Bent v. Barr*, No. 4:19-cv-06123, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020); *Malam v. Adducci*, No. 2:20-cv-10829-JEL-APP, 2020 WL 1809675 (E.D. Mich. Apr. 9, 2020); *Bahena Ortuño v. Jennings*, No. 20-cv-2064, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020); *Malam v. Adducci,* No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020); *Robles v. Wolf*, No. 5:20-cv-627-TJH-GJS, Dkt. 32, 35-39 (C.D. Cal. Apr. 2, 2020); *Hernandez v. Wolf*, No. 20-cv-617, Dkt. 17 (C.D. Cal. Apr. 1, 2020); *Bravo Castillo v. Barr*, --- F. Supp. 3d ----, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Thakker v. Doll*, --- F. Supp. 3d ----, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Jimenez v. Wolf*, No. 1:18-cv-10225-MLW, Dkt. 507 (D. Mass. Mar. 26, 2020).

[10] Mr. LaBonte mentions a detainee tested due to potential COVID-19 symptoms, apart from the general testing. Dkt. No. 271-2 ¶ 18. This is presumably Mr. Hernandez, whose bail hearing was delayed when he was tested June 9.

June 18, 2020) ("*Savino III*") (citation omitted).

### 2. Size of Wyatt's ICE Population

The government argues that further relief is unnecessary since, "[m]ost critically, ICE detainees at Wyatt are no longer overcrowded because all but 21 ICE detainees ha[d] been removed from Wyatt" as of June 24. Mot. 17. However, that "critical" reduction in the ICE population was achieved by the Court's orders. "Were it not for the Court's bail orders . . . the Detainees would be packed together in close quarters where social distancing is impossible." *See Savino II*, 2020 WL 2404923, at *7; *see also id.* at *5 ("The Court presumes that, in ordering the release on bail of a portion of the Detainees, it has substantially reduced the risk of infection for those who remain. Yet the threat persists."). This critical factor cannot be relied upon by the government as indicating that *it* (or Wyatt) has taken reasonable steps to ensure social distancing. *See id.* at *7 ("It is the government's *response* to the pandemic that matters.") (emphasis in original). The government points to no ICE or Wyatt policy to ensure the class size will not exceed the number of single cells without this Court's intervention. To the contrary, the government appears to assume that ICE will push the population past that threshold absent an injunction. *See* Mot. 20.

From June 25 to July 13, Wyatt's detainee population increased from 493 to 526 detainees, and the ICE population was up more than 40% to 30 detainees. Exh. C, July 13 Status Report, at 1. It is thus "likely that the gains in density reduction achieved through the bail orders w[ill] be jeopardized by new arrivals." *Savino II*, 2020 WL 2404923, at *7. And as in *Savino*, there is no indication that ICE has ever "formulated a plan to determine a safe population level [for ICE detainees at Wyatt] or how to reach that mark." *See Savino II*, 2020 WL 2404923, at *9.

Moreover, while the government now acknowledges that a substantial reduction in population was "critical[]" to ensure that ICE detainees "are no longer overcrowded," Mot. 17,

here as in *Savino* the government resisted the bail process every step of the way. *See Savino II*, 2020 WL 2404923, at *9 ("A wholesale blockade on bail . . . cannot be justified when the government proffers no alternative method of reducing the population to a safe number."). Like *Savino*, "[t]his is emphatically not a case in which the government 'has been working toward *exactly* what the plaintiffs seek: a reduction in [the facility]'s population.'" *Savino III*, 2020 WL 3529664, at *3 (emphasis in original). Therefore, the government cannot count the critical reduction in Wyatt's ICE population—effected largely by this Court or under direct pressure from it—as evidence of ICE's own "intentional" and "appropriate action" in response to the clear "risks of the virus and its horrifying infectiousness." *See* Dkt. No. 59, June 2 Order, at 3-5 & n.3.

Furthermore, Mr. Greenbaum's July 13 declaration concerning ICE's new transfers into Wyatt asserts that ICE's detention capacity in New England is limited in part because "ICE has agreed to only place detainees at the Strafford County House of Correction in New Hampshire [at issue in the *Gomes* litigation] if such detainees are not transferred from a state facility that has experienced a COVID-19 positive case." Dkt. No. 319-1 ¶ 15. The clear implication is that ICE intends to transfer detainees from state institutions with positive cases into Wyatt instead. And as Petitioners previously explained, the inherently high risks of infection and outbreak at Wyatt are exacerbated by admitting additional detainees, particularly from other congregate facilities. *See* Dkt. No. 15-1 at 26-30. Accordingly, "[b]arring the government from adding new detainees [would] ameliorate[] the twin problems of detainee density and transience." *Savino II*, 2020 WL 2404923, at *6; *see also* Dkt. No. 1-6, Schriro Decl., ¶ 45 ("The optimal way to protect medically vulnerable persons who are detained today, and to reduce the likelihood of infecting others in the weeks and months to come, is that ICE should reduce the census as much as it can, as quickly as possible, *and then sustain it*.") (emphasis added); Exh. E, CDC, Interim Guidance on Management

of COVID-19 in Correctional & Detention Facilities, July 14, 2020 ("CDC Detention Guidance"), at 13 (recommending that detention facilities "[s]uspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding"). For these reasons alone, the Court should grant Petitioners' motion for a preliminary injunction barring new admissions and deny the government's request to dissolve the class bail order.

### 3.  Meals

In its June 2 order, the Court found that "detainees are required to stand in line to receive meals, a process which also makes social distancing impossible"; that "[m]ealtimes are congregate, with '1-2 detainees at a 4-person table,' . . . making social distancing impossible during all meals"; and that, "of course, . . . eating[] is an activity that precludes [detainees] from remaining masked." Dkt. No. 59 at 8-9.[11] The government suggests that these issues are now resolved because class members "all are being given the option to remain in their cells during mealtimes." Mot. 4; *accord id.* at 8, 17.

But the government's submissions and Wyatt's latest status reports leave fundamental concerns unaddressed. There is no indication of how many (if any) ICE detainees are taking up this offer, and no indication that those who opt to *eat* in their cells can avoid lining up to get their food. *See* Dkt No. 271-1, Martin June 23 Decl., ¶¶ 26-29; Dkt. No. 271-2, LaBonte June 23 Decl., ¶ 22; Exh. C, July 13 Status Report, ¶ 9(a). Warden Martin merely states that "detainees are *supposed to* wear masks and maintain physical distancing while standing in line to get their trays," which generally takes "3 to 5 minutes." Dkt. No. 271-1 ¶ 26 (emphasis added). There is no

---

[11] The government has never disputed that the tables "are about three or four feet in diameter." Dkt. No. 1-3, Baez Decl., at ¶ 21; *see also* Dkt. No. 1-1, Yanes Decl., at ¶ 13.

indication that mask-wearing and social distancing are enforced. Indeed, Wyatt's latest status report does not indicate that masks—or gloves or soap—have been distributed to detainees since May 21. Exh. C, July 13 Status Report, ¶ 18. Making matters worse, "[a]t meal times, detainees are [still] instructed to spread out *two people per table*." Dkt. No. 271, Martin June 23 Decl., ¶ 28 (emphasis added).

The government's own submissions thus reflect Respondents' continued unwillingness to address fundamental, well-known realities of COVID-19 transmission and the need for social distancing. These conditions are plainly unreasonable in a setting where "the government has the obligation 'to provide reasonable safety for all residents and personnel within the institution.'" *See* Dkt. No. 59, June 2 Order, at 3 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)); *see also* Exh. E, CDC Detention Guidance, at 4 ("Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID-19.").

### 4. Congregate Exercise and Shower Facilities

The government's submissions and Wyatt's latest status reports also fail to address the Court's prior concerns with congregate exercise and shower facilities, Dkt. No. 59, June 2 Order, at 9, other than to say that "ICE detainees . . . are being given the option to remain in their cells . . . during recreation time." Mot. 4; *accord id.* at 8, 17. Class members are already being locked in their cells nearly 20 hours a day. Dkt. No. 271-1, Martin June 23 Decl., ¶ 19. On top of that, they must (1) either refrain from leaving their cells—even when permitted—for the essential activities of bathing, socializing, and exercising, or (2) perform them in spaces where social distancing and mask-wearing are not enforced or ensured. Such conditions hardly indicate that these *civil* detainees' confinement is non-punitive. *See* Dkt. No. 1-4, Amon Decl., ¶ 50.

### 5. Circulation of Staff Through Different Housing Units

The Court also previously expressed concern that Wyatt "[s]taff are mingled throughout the institution" and "there appears to be no attempt to limit the number of different staff with whom detainees come into contact."  Dkt. No. 59, June 2 Order, at 9. Nothing has been done to address these concerns. To the contrary, Wyatt's pre-pandemic "approach to scheduling and movement of staff within the Facility has remained consistent during the pandemic." Dkt. No. 271-1, Martin June 23 Decl., ¶ 6. Under that approach, staff circulate through multiple different "areas and units within the Facility," rather than being assigned to a particular housing unit. *Id.* Additionally, Wyatt evidently still has no regular, mandatory testing regime in place for its staff. *See, e.g.*, Exh. C, July 13 Status Report, at 1 (3 active cases "self-reported by staff"). And as of June 23, ICE detainees continued to be spread across three different housing units: one was in pod G (along with an unstated number of non-ICE detainees); five were in pod J-1 (along with 8 non-ICE detainees); and 15 were in pod J-2. Dkt. No. 271-1 at 3 tbl. & ¶¶ 10, 12.

### 6. ICE's Failure to Identify and Consider Releasing Medically High-Risk Detainees

Finally, one of the weightiest factors in the Court's earlier analysis was that ICE had not "undertaken any real effort to ascertain the underlying medical conditions" of its Wyatt detainees, contrary to its own agency directives and the *Fraihat* injunction. Dkt. No. 59, June 2 Order, at 13; *see also Fraihat*, 2020 WL 1932570, at *16 n.20, *29 (requiring ICE to identify detainees with risk factors, including hypertension, by April 30—"or within five days of their detention" for new detainees—and "make timely custody determinations" as to whether to release those medically high risk detainees).

The government's motion attempts to address its earlier failures by stating that (1) "*Wyatt has reviewed the [Wyatt] medical records* of all detainees in order to determine which detainees

may be at high risk for complications due to COVID-19"; (2) "*[t]his Court* has also reviewed the medical histories of the remaining ICE detainees and made determinations regarding whether their health histories have justified immediate release from Wyatt"; and (3) the government "addressed whether each detainee falls into a high-risk category throughout the bail hearing process." Mot. 4, 15 n.11 (emphases added); *accord id.* at 8, 17. That Wyatt's physician has now reviewed Wyatt's own limited records to identify which records reflect medical vulnerabilities merely underscores that not even this basic step had been taken before. Moreover, *Wyatt's* review does not cure *ICE's* objectively unreasonable conduct—especially absent evidence that ICE has even received that information, let alone acted on it. Notably, none of the government's submissions concerning ICE's new admissions to Wyatt contain any information concerning the new detainees' medical conditions. *See* Dkt. Nos. 289, 290, 292, 319.[12] Class counsel has already learned that one of the new class members suffered a stroke in recent years—a potential indicator of coronary disease— and another is HIV positive and also has asthma.

It is even clearer that ICE's failings are not alleviated by *the Court's* review of medical records or by the government's repeated baseless arguments that individuals with CDC-recognized comorbidities such as hypertension and obesity are at no heightened risk—even after the Court recognized both conditions as "known vulnerabilities." Dkt. No. 59, June 2 Order, at 10; *see, e.g.*, *Savino II*, 2020 WL 2404923, at *7-9 (court-ordered measures are not reasonable steps *by the government*, and the government's "obstinate[]," "wholesale" opposition to bail was evidence of

---

[12] There is no indication that ICE's discretionary release of recently-admitted detainee Mr. Escoto-Martinez on July 6 was based on any such medical review. The July 13 declaration from ICE official Greenbaum makes no reference to ICE receiving or reviewing any list of medically-vulnerable detainees at Wyatt prepared by the facility. *See* Dkt. No. 319-1. It asserts only that ICE "inquire[s] as to any medical conditions or vulnerabilities when it arrests an individual" and that "[i]f such individual advises ICE . . . to such medical condition or vulnerability, ICE will consider it when determining whether detention is appropriate and will convey this information to Wyatt upon placement." *Id.* ¶ 18. This Court previously indicated that relying only on "oral [medical] histor[ies] given by the detainee[s]" is insufficient. Dkt. No. 59, June 2 Order, at 11-12.

deliberate indifference); *Savino III*, 2020 WL 2404923, at *1 (similar).[13]

Finally, none of the government's latest submissions suggest that ICE is taking measures that the Court suggested could constitute a "real effort to ascertain the underlying medical conditions of the detainees"—i.e., arranging "thorough medical evaluation[s] . . . with appropriate diagnostic testing," or at the very least obtaining the medical records from the state facilities from which many class members are transferred. *See* Dkt. No. 59, June 2 Order, at 11, 13. Because "[m]ost, if not all, detainees brought to the Wyatt facility arrive there without any medical records," and Wyatt's medical records "begin at the date of intake at the Wyatt detention facility," the government again "does not actually know which [new ICE] detainees have underlying medical conditions that put them at extreme risk should they contract COVID-19." *See id.* at 11-12.

For all of these reasons, the Court should entertain bail applications from the new detainees ICE has added to the class. Moreover, "to preserve the status quo," *CMM Cable Rep., Inc.*, 48 F.3d at 620, and prevent "the gains in density reduction achieved through the bail orders [from] be[ing] [further] jeopardized by [more] new arrivals, *Savino II*, 2020 WL 2404923, at *7, the Court should enter a preliminary injunction barring ICE from admitting additional outside detainees.

## C.   The Minimal Injunction Alternatively Proposed by the Government Would Not Preserve the Status Quo or the Gains of the Bail Process.

In the alternative to its sweeping requests that the Court decertify the class, refuse to entertain any more bail requests, and deny all further classwide relief, the government proposes that the Court order that Wyatt and ICE carry on extremely minimal practices concerning (1) testing of new ICE detainees, (2) single-celling ICE detainees only so long as "the Facility's

---

[13] The government instead insisted that the Court could look only to one explicitly non-exhaustive CDC webpage. On June 25, even that webpage was updated to include BMI of 30 or higher and hypertension, which had by then been well-recognized for months as leading comorbidities. *See* Exh. F, CDC, People Who Are at Higher Risk for Severe Illness, June 25, 2020, at 1; Dkt. No. 1-4, Amon Decl., at ¶ 31(a) (citing April 8 CDC report).

ICE census permits," (3) Wyatt's coordination with the state health department. Mot. 19-20. Petitioners do not oppose the Court ordering the continuation of these or other current practices as part of freezing in place a baseline going forward. But it is troubling that the government suggests that there is *any possibility* that such barebones measures could be abandoned anytime in the foreseeable future without this Court ordering them to continue. Moreover, the government's proposed measures are inadequate to maintain the status quo because they do not prevent ICE from transferring new detainees into Wyatt, as they have done repeatedly over the past two weeks. Additionally, the government's proposed end-date for such an injunction—"the date on which [this Court] allows in-person hearings to resume," *id.* at 19—is arbitrary in light of the profound and obvious differences between a courthouse and a congregate detention center. *See, e.g.*, Exh. E, CDC Detention Guidance, at 1 ("Incarcerated/detained persons live, work, eat, study, and participate in activities within congregate environments, heightening the potential for SARS-CoV-2 to spread once introduced.").

Petitioners oppose the government's suggestion of administrative closure, *see* Mot. 20, at least without an injunction barring new admissions and before all recently-added class members have a chance to submit bail applications.

## CONCLUSION

For the foregoing reasons, this Court should deny the government's June 24 motion (Dkt. No. 271) and enter preliminary injunction barring ICE from transferring new detainees into Wyatt.

Dated: July 15, 2020

Respectfully Submitted,

s/ Morgan Russell
Morgan Russell*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
T: 415-343-0770
mrussell@aclu.org

Lindsey Kaley*
American Civil Liberties Union Foundation,
Center for Liberty
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2500
lkaley@aclu.org

David C. Fathi**
Eunice H. Cho**
American Civil Liberties Union Foundation,
National Prison Project
915 15th St. NW, 7th Floor
Washington, DC 20005
T: 202-548-6616
dfathi@aclu.org
ECho@aclu.org

Deborah S. Gonzalez, Esq., Bar No. 7931
Jared Goldstein*
Roger Williams University School of Law
Cooperating Attorneys, American Civil
Liberties Union Foundation of Rhode Island
1 Empire Street, Suite 435
Providence, RI 02903
T: 401-486-7230 (C)
dgonzalez@rwu.edu
jgoldstein@rwu.edu

Omar Jadwat*
Michael K.T. Tan*
American Civil Liberties Union Foundation,
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
ojadwat@aclu.org
mtan@aclu.org

Susan Baker Manning*
Natalie A. Bennett*
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
T: 202-739-3000
susan.manning@morganlewis.com
natalie.bennett@morganlewis.com

Counsel for Petitioners

*Admitted Pro Hac Vice
**Admitted Pro Hac Vice; Not admitted in
D.C., practice limited to federal courts

James P. Looby*
Alborz Hassani*
Morgan, Lewis & Bockius LLP
77 West Wacker Drive | 5th Floor
Chicago, IL 60601
T: 312-324-1000
james.looby@morganlewis.com
al.hassani@morganlewis.com

Stephanie Faraci*
Morgan, Lewis & Bockius LLP
One Federal Street
Boston, MA 02110-1726
T: 617-341-7700
stephanie.faraci@morganlewis.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2020, I electronically filed the foregoing document with the United States District Court for the District of Rhode Island by using the CM/ECF system. I further certify that counsel for all parties are registered as ECF Filers and will be served by the CM/ECF system.

<u>/s/ Morgan Russell</u>
Morgan Russell